## Case No. 6,306.

### HEATH et al. v. ERIE RY. CO. et al.

[8 Blatchf. 347.] [1]

Circuit Court, S. D. New York. April 27, 1871.

PRIVATE CORPORATION — RIGHTS OF STOCKHOLDER — ISSUANCE OF SHARES — ULTRA VIRES — DEMURRER TO BILL — PARTIES — AMENDMENT.

1. The cases reviewed, on the question as to when a stockholder in a private corporation will be allowed to file a bill in his own name, on behalf of himself and all others standing in the same situation, making the corporation a party defendant, to compel the ministerial officers of the corporation to account for breach of official duty or misapplication of corporate funds.

[Cited in Hardon v. Newton, Case No. 6,054; Ranger v. Champion Cotton-Press Co., 52 Fed. 615.]

[Cited in Bulkley v. Big Muddy Iron Co., 77 Mo. 106; Brinckerhoff v. Bostwick, 88 N. Y. 56, 60; Byers v. Rollins, 13 Colo. 22, 21 Pac. 896.]

2. Where the bill sets out acts ultra vires, in issuing shares of stock, and breaches of trust, which are frauds on the stockholders, inasmuch as such acts and breaches of trust are beyond the power of the corporation to affirm or sanction, it is not necessary that the stockholder should aver that he has applied to the corporation or its board of directors to bring the suit, and that they have refused.

[Cited in U. S. v. Union Pac. R. Co., Case No. 16,598.]

3. If a demurrer to a bill in equity covers the whole bill, when it is good to a part only, it will be overruled.

4. Where the corporation is under the control of the defendants who must be sued, and an excuse is given for the bringing of the suit by the stockholder, which is equivalent to a refusal by the directors, on request, to bring the suit, the suit may be brought by the stockholder, without showing such request and refusal.

5. A person not a stockholder cannot be joined as plaintiff, in such a bill, with persons who are stockholders, and, if the suit is a joint one, his want of interest is a good ground of demurrer to the whole bill.

[Cited in Brown v. Duluth, M. & N. Ry. Co., 53 Fed. 894.]

6. A person who has no shares standing in his name on the books of the corporation, is not a stockholder, although he holds certificates of stock issued to other persons by the corporation, with powers of attorney authorizing the transfer of such shares to him, executed by the persons in whose names the shares stand registered on the books of the corporation, and although the corporation has, on demand, wrongfully refused to allow such transfer to be made to him.

7. If several trustees are all of them implicated in a common breach of trust, for which the cestui que trust seeks relief in equity, he may bring his suit against all of them, or against any of them separately, at his election, the tort being treated as several as well as joint.

[Cited in Trustees of Mutual Building Fund v. Bosseiux, 3 Fed. 836; Boyd v. Gill, 19 Fed. 146; Ervin v. Oregon Ry. & Nav. Co., 20 Fed. 582; Wall v. Thomas, 41 Fed. 621.]

8. The same doctrine applies to any wrongdoer who is confederated with a fraudulent trustee.

9. A general demurrer to the whole of a bill cannot be sustained as a demurrer to relief

prayed in respect of persons who are not made parties to the bill.

10. It is not necessary that the directors of the corporation should be made parties to the bill, although the bill prays for an injunction against the corporation, and for a receiver of the corporation, if no relief is asked as against such directors.

11. If the plaintiff waives an answer on oath, the defendant has a right to answer on oath, notwithstanding such waiver, and the tender of the waiver is no ground of demurrer to the bill. If the tender is not accepted, the defendant is still bound to answer the bill, either without oath or on oath.

[Cited in Amory v. Lawrence, Case No. 336.]

12. The bill, in this case, was allowed to be amended by striking out the name of a person improperly joined as plaintiff.

In equity. This case came up on four separate demurrers to the whole bill, by the four several defendants, the Erie Railway Company, Jay Gould, James Fisk, Junior, and Frederick A. Lane, who were the only defendants in the suit. The bill was sworn to on the 8th of April, 1870, and filed on the same day. It was brought by eight persons [John Benjamin Heath and others] as plaintiffs, all of whom were aliens and British subjects. Six of the eight plaintiffs were the owners of shares of what was known as the common capital stock of the defendants, the Erie Railway Company, which was a corporation created under the laws of the state of New York, and which shares stood in their names on the books of the company. One of the eight plaintiffs was the owner of shares of what was known as the preferred capital stock of the company, and which shares stood in his name on the books of the company. The remaining plaintiff, Burt, was alleged to be the owner and holder of shares of the preferred capital stock of the company, for which he held certificates issued by the company, but not to him, and a power of attorney, authorizing the transfer of the shares to him, executed by the persons in whose names such shares stood registered on the books of the company. It was also alleged that he was entitled to have such shares standing in his name on the books of the company, but that he had been prevented therefrom by the wrongful refusal of the company to allow such transfer to be made to him, upon his demand duly made therefor.

The bill was very voluminous. Its allegations were, in substance, as follows:

(1.) The company owns and operates a railroad extending from Dunkirk and likewise from Buffalo, on Lake Erie, to Piermont and Newburgh, on the Hudson river, twenty-six miles of the route being through the state of Pennsylvania, and the rest through the state of New York, and also controls and operates a line of railroad, extending from its main line to Jersey City, with a ferry connection to the city of New York.

(2.) On the 31st of December, 1865, the capital stock of the company consisted of $8,535,-

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

700, of preferred stock, and $16,570,100, of common stock, being a total of $25,105,800, in shares of $100 each, the preferred stock being entitled, in preference over the common stock, to dividends up to the rate of seven per cent. per annum, payable semi-annually out of the net savings of the railroad during the current year, after the payment of mortgage interest.

(3.) At the election for directors of the company, seventeen in number, in October, 1867, the defendants Gould, Fisk and Lane, and one John S. Eldridge, were the chief movers in a combination which resulted in the election as directors of themselves and five new directors and eight old directors, Lane having been a director during the previous year, and Gould, Fisk and Eldridge being also new directors. The directors so elected, other than Gould, Fisk, Lane and Eldridge, were Henry Thompson, Levi Underwood, Josiah Bardwell, Eben D. Jordan, James S. Whitney, William Evans, Alexander S. Diven, J. C. Bancroft Davis, Homer Ramsdell, Dudley S. Gregory, William B. Skidmore, Frank Work and George M. Groves.

(4.) This election was accomplished chiefly or entirely by illegitimate means, namely, by the purchase of proxies for voting, and by borrowing or purchasing and holding, for the briefest possible period, shares of stock, in order that the same might stand in the names of some of the parties acting in concert with them, or whose proxies they could obtain on the day of closing the transfer books preparatory to the election, the plan being to obtain control of the company without any real proprietorship in any considerable portion of its stock, in order that such control might be made subservient to the private gain of the majority of the board, consisting of the new members and Lane, without regard to the interests of the company, or the equitable rights of its real shareholders.

(5.) The chief immediate object in obtaining control of the company at the time, was to commit it to engagements in aid of the building of the Boston, Hartford and Erie Railroad, in which some of the parties, and particularly Eldridge, was largely interested; and such aid was given in the form of a guarantee by the company of the bonds of the Boston, Hartford and Erie Railroad Company, to the amount of $5,000,000, which bonds were put into circulation.

(6.) The Boston, Hartford and Erie Railroad Company has suspended payment.

(7.) The election of directors in October, 1867, was accomplished by the use of about $70,000 of the money of the Boston, Hartford and Erie Railroad Company, placed in the hands of Gould for the purpose.

(8.) The furnishing of the money, its use, the accomplishment of the election, and the guarantee of the bonds, were all part of a fraudulent conspiracy by which, in return for the money to accomplish the election, Gould, Fisk and Lane should betray their trust as directors by using their influence in favor of the guarantee of the bonds, to the prejudice of the interests of the company, and should find their own compensation in such personal advantages as they could obtain by means of their trust and power as directors.

(9.) On the 30th of September, 1867, the total amount of the preferred and common stock of the company was $25,111,210.

(10.) In February, 1868, the total amount of the stock was $32,801,910, being $8,536,910 of preferred stock and $24,265,000 of common stock.

(11.) Up to February, 1868, the company had not only met the interest on its bonds, but had paid regular cash dividends of seven per cent. per annum on its preferred stock, and dividends, although not regularly, on its common stock, and the market value of its common stock was between 70 and 80 per cent.

(12.) In February, 1868, the company had its roads in successful operation, and substantially owned the property of the Long Dock Company, and also owned a large amount of property proper for use in operating its roads, which consisted of 459 miles of main road and 314 miles of branches and leased roads, there being a double track of about 362 miles on its main line, and its average gross earnings for the three years then last past had been about $15,000,000 per year.

(13.) In February, 1868, Gould, Fisk and Lane, with others of the directors, put in execution the scheme of making further large issues of the common stock of the company, under color of the authority alleged to be conferred by the 10th subdivision of the 28th section of the general railroad act of New York, of April 2d, 1850 [Laws 1850, p. 225], and which they claim to be applicable to the company, notwithstanding the special provisions of the acts of April 4th, 1860 [Laws 1860, p. 257], April 2d, 1861 [Laws 1861, p. 213], and March 28th, 1862 [Laws 1862, p. 208], fixing its capital stock at $11,500,000 of common stock, and $8,535,700 of preferred stock, and the provision of the act of May 4th, 1864 [Laws 1864, p. 1303], authorizing an increase of $8,000,000, such 10th sub-division providing, that the corporations thereby referred to should have power, "from time to time, to borrow such sums of money as may be necessary for completing, and finishing or operating, their railroad, and to issue and dispose of their bonds for any amount so borrowed, and to mortgage their corporate property and franchises, to secure the payment of any debt contracted by the company for the purposes aforesaid; and the directors of the company may confer on any holder of any bond issued for money borrowed as aforesaid, the right to convert the principal due or owing thereon into stock of said company, at any time not exceeding ten years from the date of the bond, under such regulations as the directors may see fit to adopt."

(14.) In execution of such scheme, the said confederates caused to be executed the bonds of the company to the amount of $5,000,000, purporting to confer upon the holder the right to convert the principal sum into stock of the company, and made a pretended issue of such bonds to some of the directors or their confederates; and almost immediately thereafter, and on or about the 19th of February, 1868, there was made a conversion, or pretended conversion, of such $5,000,000 of bonds into stock of the company; and thereupon, under the direction of Gould, Fisk and Lane, and their confederates, there were issued certificates for the common stock of the company, to the amount of $5,000,000, in 50,000 shares, which were put on the market and sold to bona fide purchasers.

(15.) The only consideration which the company received for the bonds was received from the proceeds of the sale of the stock.

(16.) The amount which the company in any way received, in respect of the bonds and stock, did not exceed $3,625,000, or 72½ per cent. of the par value thereof; but a large sum was realized therefrom by Gould, Fisk and Lane, and their confederates, and divers methods were adopted to cover up and conceal the excess and deprive the company of the benefit thereof, and enable the said confederates to retain the same for their private profit.

(17.) In or about March, 1868, there were issued, and put on the market, and sold to bona fide purchasers, an additional 50,000 shares, or $5,000,000 in amount, of the common stock of the company.

(18.) Such transaction consisted in putting into the hands of some persons acting in confederacy with Gould, Fisk and Lane, and their associates, convertible bonds of the company for $5,000,000, but no money was loaned or advanced to the company upon the bonds, or any consideration received by it from them. With full notice of an injunction, restraining the issue of the stock, certificates for such additional 50,000 shares of stock were by Fisk, with the concurrence of Gould and Lane, caused to be filled out. 250 certificates, for 100 shares each, certifying that the firm of Smith, Gould, Martin & Company, stock brokers, of which firm Gould was then a member, were the owners of the stock mentioned therein, and 250 other certificates, for 100 shares each, certifying that the firm of Fisk, Belden & Company, stock brokers, of which firm Fisk was a member, were the owners of the stock mentioned therein. Thereupon, by the direction and procurement of Gould and Fisk, confederating with Lane and others, such certificates were sold to bona fide purchasers by the said firms to which they were issued, the price being about 80 per cent. of the par value thereof, or $4,000,000. Only a portion of this amount, namely, $3,625,000, or at the rate of 72½ per cent. for the stock, was ever paid or accounted for to the company, and the residue of the proceeds, being the sum of $375,000, was wrongfully withheld from the company by Gould and Fisk, in combination with Lane and others.

(19.) Almost immediately after the last 50,000 shares of stock were issued, Gould, Fisk and Lane, with certain of their confederates, in order to avoid the legal consequences of their acts, and to withdraw the pecuniary fruits of the operation from the jurisdiction of the courts of the state of New York, fled to Jersey City, carrying with them many millions of dollars, the property of the company, being proceeds of the stock or bonds, and remained there until they succeeded, by the use of the money of the company and other corrupt means, in effecting arrangements for their return, when they returned.

(20.) During such period, Gould, Fisk and Lane and their confederates employed paid guards, and expended money otherwise for expenses which were not lawful charges against the company, but were paid out of the funds of the company by their procurement, some of it being used to influence and obtain action by the legislature of the state of New York in respect to the issue of the bonds and stock, and the transactions connected therewith, which money has never been refunded or accounted for to the company.

(21.) The issuing of the bonds and of the 100,000 shares of stock was substantially legalized by an act of the legislature of New York, passed April 21st, 1868, which declared as follows: "It shall be lawful for the Erie Railway Company to use the money realized from the convertible bonds issued by said company on the 19th day of February and on the 3d day of March, 1868, the said bonds amounting in all to $10,000,000, for the purpose of completing, furnishing, and operating its railroad, and for no other purpose. Nothing in this section contained shall affect any right of action of any person against any officer or agent of the Erie Railway Company, nor shall it affect any action or proceeding now pending, save as herein expressly provided, nor shall anything therein contained be held or construed to affect any liability, civil or criminal, of any officer or agent of the said Erie Railway Company, or any other person. The use of the moneys in this section mentioned, by any officer or agent of said railway company for any other purpose than is herein mentioned, shall be a felony, punishable, upon conviction thereof, by imprisonment in the state prison for not less than two nor more than five years."

(22.) In July, 1868, Eldridge resigned his presidency of the company, as the result of an agreement between him and Gould. Fisk and Lane, that he should do so, and that the company should purchase the bonds of the Boston, Hartford and Erie Railroad Company, to the amount of $5,000,000, or thereabouts. Jay Gould was made president

'in his place. At the same time, Gould, Fisk and Lane secured the control of the executive committee of the company, by becoming three of its five members, and the company, by the procurement of Gould, Fisk and Lane, purchased the bonds of the Boston, Hartford and Erie Railroad Company, to the amount of $5,000,000, and they were paid for out of the funds of the company.

(23.) Such purchase of bonds was illegal and beyond the corporate powers of the company, and resulted in a large loss to the company. Gould, Fisk and Lane concurred in the purchase, not only knowing it to be illegal and prejudicial to the interests of the company, but from the corrupt motive of inducing Eldridge thereby to resign his presidency, and of their being thereby enabled to substitute Gould as president, and acquire complete practical control of the company. At the time, Gould, Fisk, Lane and Eldridge had such control of the company, that the other directors, except the immediate friends of Eldridge, had little influence, and most of them were ignorant of what was transpiring and what was intended.

(24.) By an arrangement made in or about July, 1868, Gould, Fisk and Lane obtained the discontinuance and withdrawal of certain suits and litigations in which they and Eldridge were involved, and to some of which the company was a party, which suits had grown out of the proceedings relating to the said convertible bonds and stock, and other wrongful acts of such four parties and their confederates in and about the affairs of the company, it being supposed that one Cornelius Vanderbilt was promoting such suits, though not a party to them, and it being an object of Gould, Fisk and Lane to induce the withdrawal from the board of directors of said Frank Work, who was hostile to them, and understood to be in alliance with the parties carrying on the suits. By such arrangement, they also obtained their own personal relief from accountability in such suits, and for the moneys of the company which they had illegally retained, and the withdrawal of Work from the directorship, and the quieting of the opposition of Vanderbilt to the then past and proposed future spoliation of the company's funds, property, and credit by them and their confederates, which objects were for the personal gain of them and their confederates, and not for the benefit of the company, and were accomplished by them not at their own cost, but at the expense of the company, and mainly by the payment of money from the funds of the company to the parties with whom the settlement was effected, as the consideration for the settlement, and for the personal advantages thereby secured to Gould, Fisk, and Lane, and their confederates, but not in discharge of any legal claim against the company in favor of such parties.

(25.) Such payments out of the funds of the company by the procurement of Gould, Fisk, and Lane, and their confederates, were —$429,000 in settlement of a suit of one Richard Schell, and in compromise of some claim made by him, such suit being founded on the wrongful acts of Gould, Fisk, Lane, Eldridge, and their confederates, and being a claim against them personally, and not a valid demand against the company—$1,000,000 paid as a bonus or subsidy to Vanderbilt, which was not on account of any legal demand of his against the company, but was made on considerations personal to Gould, Fisk, and Lane, and their confederates—the purchase from Vanderbilt of 50,000 shares of the stock of the company at the rate of about 70 per cent. of its par value, and at a price greatly exceeding its then market value, for which there was paid to Vanderbilt, from the funds of the company, about $3,500,000, such purchase being illegal, wasteful, and fraudulent, and resulting in a large loss to the company.

(26.) On that occasion, other large sums were paid from the funds of the company, by the procurement of Gould, Fisk, and Lane, and their confederates, for what were not legal charges against the company, but for the personal benefit of them or their confederates.

(27.) About the same time, from $20,000 to $50,000 was wrongfully received out of the funds of the company by Gould and Fisk, or one of them, for an illegal and unfounded claim of them, or one of them, against the company.

(28.) When such payments were made to Schell and Vanderbilt, Gould was the treasurer of the company, and had custody of its funds, and, as such treasurer, participated in making the payments to Vanderbilt, and in settling the suit and claim of Schell, and endorsed over to such parties the checks by which the payments were made, which were drawn against funds in bank belonging to the company, and he did so knowing that the payments were illegal.

(29.) In or about July, 1868, Daniel Drew, who had until then been treasurer of the company, resigned that office, and Gould was made treasurer in his place, and received from the former treasurer cash funds of the company to the amount of more than $5,500,000, nearly all of which was proceeds of the $10,000,000 of convertible bonds, or the 100,000 shares of stock. In addition to this, and to the current receipts of the company from its earnings, Gould, as such treasurer, received, between July, 1868, and October, 1868, about $1,000,000 from the proceeds of sterling bonds of the company which remained on hand when he became treasurer.

(30.) From July, 1868, when Eldridge retired and Gould was made president, until October, 1868, as well as subsequently, Gould, Fisk and Lane had practically in their own hands the entire control of the affairs and funds of the company.

(31.) In or about July, 1868, Fisk was made comptroller of the company, and has since continued to exercise, except as Gould and Lane have participated therein, control over the allowance and disallowance of claims against the company. Gould, as president and treasurer of the company, has had supreme control over the company's funds, except in so far as Fisk and Lane may have participated therein, and has made such uses thereof from time to time as would best serve the ends of himself and Fisk and Lane. Lane at the same time was made, and has thenceforth continued to be, the counsel of the company, with the addition of large powers to those previously exercised by the counsel of the board.

(32.) During the period from July to October, 1868, the board of directors of the company held no meeting, and had no participation in the control of the affairs of the company, but, whatever of such control was not exercised by Gould, Fisk and Lane, in their said offices, was exercised by them as the controlling and always co-operating majority of the executive committee, the other two members of such committee being by Gould, Fisk and Lane systematically kept in great measure ignorant of the important doings of the committee, and no proper minutes of its proceedings being by them allowed to be kept.

(33.) In anticipation of the election of directors to be held in October, 1868, Gould, Fisk and Lane contrived a scheme for causing themselves, and such other persons only as they should choose for the purpose, to be elected directors of the company at such election; and, in order to carry out such scheme, they put in execution divers illegitimate and fraudulent devices. Having made such arrangements as that, at a given date, a very large amount of stock should stand on the books in the names of themselves and their confederates, and of persons whose proxies for voting they could secure by purchase or otherwise, Gould, Fisk and Lane, as a majority of the executive committee, without the knowledge of the other members of the committee, and without any action or knowledge of the board of directors, or the knowledge of any member of it save themselves, and without any previous public notice of an intention so to do, suddenly closed the stock transfer books of the company on the 19th of August, being about sixty days before the annual election, and at least thirty days earlier than the by-laws of the company contemplated, or the stockholders anticipated, or than had been the usage of the company, or than was necessary for any honest or useful purpose. They pretended to keep such transfer books closed from that time until the election, so that, during such period, no stock could properly be transferred into the name of any person, so as to enable him to vote thereon, or to prevent the same from being voted on by the person in whose name it happened to stand at the time of closing the books. But transfers were, during such period, caused by Gould, Fisk and Lane to be secretly made in certain cases, where such transfer would increase the voting power of themselves and their confederates, although transfers were not permitted in any other case. Such arrangements had been made by Gould, Fisk and Lane, and their confederates, that, when the transfer books were so closed, there stood thereon in the names of themselves, and their business firms, and their confederates, the following stock: Fisk, Belden & Co., 18,300 shares; Fisk, Bradford & Co., 25,000 shares; Smith, Martin & Co., 1,800 shares; Smith, Gould, Martin & Co., 74,800 shares; and 33,740 shares in the name of another firm, the control of whose proxies for voting thereon at such election Gould, Fisk and Lane acquired, making in all 153,640 shares of stock, the voting power on which at such election was controlled by Gould, Fisk and Lane, the whole number of shares voted on at such election being 274,874.

(34.) Although, at the time of the closing of the transfer books, there stood in the names of the firms with which Gould and Fisk were connected, stock to the nominal amount of nearly $12,000,000, Gould and Fisk, as to much the greater proportion thereof, had not, nor had their said firms, any beneficial proprietorship of such stock, but they had caused it to stand in their names at that particular time, by its having been originally issued in their names for the purposes of sale, and retained in such names notwithstanding the sale thereof and a delivery by handing over certificates and powers of attorney, and by the process of borrowing or purchasing stock and holding it for the briefest possible period, in order that such stock might stand in their names at the closing of the transfer books, notwithstanding the shares might be returned or resold and parted with immediately afterwards, and delivered by handing over the certificates, with power of attorney to transfer. Such of the stock as, in fact, belonged to Gould and Fisk, or any of their firms, had, in great part, been acquired by the use of the money of the company.

(35.) Gould, Fisk and Lane made a pretended issue and delivery of convertible bonds of the company, to the amount of many millions of dollars, and caused to be executed certificates for a great amount of stock, into which such bonds were proposed to be converted, with the design of voting on such stock, if necessary, in order to control the election; but the new stock was not created, for the reason that they were enabled by other devices to cast votes enough to control the election.

(36.) Shortly before the election, Gould, Fisk and Lane, having secured to themselves the power of controlling the election, procured to be signed by several of the persons whom

they proposed to elect as directors, a paper, by which such persons pledged themselves to support the policy of Gould, or resign their directorship, and they were elected directors under said pledge.

(37.) Gould, Fisk and Lane, or one of them, voted at such election on a large number of shares, in virtue of proxies for voting which they purchased from parties in whose names the stock stood, which parties, in many of such instances, were not the actual owners of such stock, but had previously parted with it, and made delivery by handing over the certificate, with power of attorney to transfer. The price paid for such proxies was derived from the funds of the company.

(38.) At such election, in October, 1868, Gould, Fisk and Lane caused the following persons, in addition to themselves, to be elected directors of the company for the then ensuing year: William M. Tweed, Peter B. Sweeney, Daniel S. Miller, Junior, Alexander S. Diven, George M. Diven, Homer Ramsdell, John Hilton, George M. Groves, John Ganson, Charles G. Sisson, O. W. Chapman, J. C. Bancroft Davis, Henry Thompson and William B. Skidmore. Davis and Skidmore, when they came fully to understand the purposes of Gould, Fisk and Lane, resigned their offices as directors. Immediately on the election being made, a meeting of the board of directors was held, at which the only business transacted was to elect Gould, president, Alexander S. Diven, vice-president, Fisk, comptroller, and Gould, Fisk, Lane, Tweed and Miller, the executive committee; and such persons respectively held such offices until October, 1869. Miller is a brother-in-law of Gould, and wholly under his influence. Tweed was and is in entire accord with Gould, Fisk and Lane. Alexander S. Diven is a person of integrity, and good capacity, and of experience in railroad management, and had formerly been an active executive manager of the company, but the position of vice-president was a nominal one, and, especially in view of such pledge made by the directors, said Diven was powerless to thwart the schemes of Gould, Fisk and Lane.

(39.) From and after the day of such election, in October, 1868, until the election of a new board, in October, 1869, no meeting of the board of directors of the company was held, except in a single instance, where a company, with whom a contract was being made, insisted that the contract should be ratified by the board, on which occasion a special meeting of the board was called for that single purpose, and no other business was transacted.

(40.) During the entire year, from October, 1868, to October, 1869, Gould, Fisk and Lane, in virtue of their offices of president, treasurer, comptroller and counsel, and as the controlling majority of the executive committee, had in their own hands, and exercised, the absolute control of the affairs of the company, and its funds and property, and,

whatever was done, during such period, in respect of the company and its affairs, was under the control of Gould, Fisk and Lane, and they are responsible therefor, and for the results thereof, as fully as if there had been no board of directors.

(41.) During such period, not only did the board exercise no control, as a board, over the management of the company, but the doings of Gould, Fisk and Lane, as controlling members of the executive committee, were, for the most part, kept by them from the knowledge of the individual members of the board, except those of them who were on the executive committee, and those who were the close allies and confederates of Gould, Fisk and Lane, in their schemes of private gain and spoliation of the company, and, excepting those persons, the directors of the company knew little or nothing more of what was going on in its affairs, than if they had not been directors.

(42.) During the year ending September 30th, 1869, there was an apparent surplus of net earnings of the company, applicable to dividends, after paying interest on the mortgage debt, of $475,621.91, which ought to have been applied to pay a dividend on the preferred stock, and would have paid about five per cent. thereon. But no dividend was paid, and, on the allegation that the surplus earnings of the year, over mortgage interest, had been applied to expenditures for permanent improvement, the said managers of the company's affairs, in or about November, 1869, declared a dividend of seven per cent. on the preferred stock, payable in scrip, by which the amount is promised to be paid at some future period. During the year ending September 30th, 1869, the capital of the company was increased to the extent of $32,234,700, or 322,347 shares of common capital stock, of $100 each, par value. No reduction was made, during such year, in the funded debt of the company. By the report of the company, made to the state engineer and surveyor of the state of New York, for such year, it appeared, that, at the close of the year ending September 30th, 1868, the floating debt of the company amounted to $4,893,735.81, and that at the close of the year ending September 30th, 1869, there was no floating debt. In fact, there was a considerable floating debt at the close of the last-named year, but, if the above-named amount of floating debt was extinguished during such year, such debt was, in great part, illegitimate, and had been created by the illegal and fraudulent acts of Gould, Fisk and Lane, and their confederates, and the large amount of cash which Gould so received from the late treasurer in July, 1868, and which had not been appropriated to any legitimate uses of the company, prior to September 30th, 1868, was much more than adequate for the payment of such amount of floating debt. The expenditures during the year ending September 30th, 1869, under the head of "cost of

road and equipment," were $3,832,451.96, leaving unaccounted for $28,402,248.04, of the addition so made to the share capital during such year, or, leaving unaccounted for more than $23,500,000 thereof, after deducting an alleged item of $4,813,001.08, as paid out, during such year, to or upon account of the old New York and Erie Railroad Company.

(43.) In so far as any portion of the proceeds of such additional share capital of $32,-234,700, not so accounted for, may have been expended on property of the company, such expenditures were almost wholly illegal, and were made by Gould, Fisk and Lane, or one of them, in virtue of their power as executive officers and executive committee, without any order or assent of the board of directors, and mainly for purposes foreign to the legitimate business of the company, and many of them in furtherance of the private objects of Gould, Fisk and Lane, or some or one of them, and were wasteful, and the sum total of such as were made even professedly for the company's account, is but trifling, in comparison with the unaccounted-for deficiency of proceeds of such $32,234,700 of new share capital.

(44.) Certificates for the new stock, to the amount of over 322,000 shares, of $100 each, were issued, and put in circulation, and the shares have become so mingled with the genuine stock of the company, existing on and before September 30th, 1869, that they cannot now be distinguished or separated therefrom.

(45.) Such new stock was put in circulation by Gould, Fisk and Lane, without any resolution of the board purporting to authorize it, and without any authority therefor in any way derived from the then existing stockholders, and the transactions of its issue were carried on by Gould, Fisk and Lane, merely by the exercise of their power as executive officers and executive committee. For the most part, the issues of the new stock were made by Gould, Fisk and Lane secretly, and it was sold in small parcels to bona fide purchasers, while they and the community were ignorant that such large issues were being made.

(46.) The only authority under which new stock of the company could lawfully be created by it during the year in which such new stock was issued, is to be found in the power of the company to issue shares of its stock in exchange for stock of other railroad companies which might be consolidated with it, or whose roads might be leased to it, and in the power to issue shares on the conversion into stock of valid convertible bonds previously issued by the company, containing the privilege to the holders to convert such bonds into an equal amount of stock at par.

(47.) No portion of such stock issued in the year ending September 30th, 1869, was issued in exchange for the stock of any other railroad company, and no portion of it was issued on the conversion of any valid bonds of the company which were outstanding on September 30th, 1868, for no such bonds have been converted into stock; and, therefore, the whole of such new stock could only have been issued on the conversion into such stock of convertible bonds issued subsequent to September 30th, 1868.

(48.) The new stock was issued on the conversion of convertible bonds of the company which had been issued on its behalf during the year ending September 30th, 1869, by Gould, Fisk and Lane, in virtue of the control which they exercised as such executive officers and executive committee. The whole transaction of issuing and disposing of such bonds, and receiving their proceeds, was under the control of Gould, Fisk and Lane, save in so far as their confederates, Tweed and Miller, may have participated therein, and was devised and carried through by Gould, Fisk and Lane without any resolution of the board of directors authorizing the same, and without the knowledge and assent of the board and of the stockholders. Gould, Fisk and Lane disposed of the bonds on such terms as suited their pleasure, and received and wholly controlled the application of the proceeds.

(49.) The bonds were, as alleged by Gould, Fisk and Lane, issued under authority derived from the 10th sub-division of the 28th section of the general railroad law of New York, of April 2d, 1850. The only purpose for which such bonds could be legally issued by the company, was, "to borrow such sums of money as may be necessary for completing and finishing or operating their railroad." Such bonds were, to a great extent, sold by Gould, Fisk and Lane to some of themselves, and to business firms in which they or some of them were interested as copartners or otherwise, and particularly to Smith, Gould, Martin & Co., and Fisk, Belden & Co., and to others, the confederates, friends and personal associates of Gould, Fisk and Lane respectively. On such sale of the bonds, extravagant discounts and commissions thereon were allowed to the purchasers, and the agreement on the part of Gould, Fisk and Lane to allow them, was corrupt and fraudulent. All such allowances, and particularly where Gould, Fisk and Lane, or either of them, or any of their confederates, were interested in the purchase, were illegal and not binding upon the company. Gould, Fisk and Lane, they having issued and negotiated the bonds solely under the authority to borrow money for the purposes in that behalf limited by the general railroad act, and the bonds or stock having ultimately passed into the hands of bona fide purchasers, are liable to the company and its bona fide shareholders for sums equal to the face of the bonds, as for so much money borrowed by them on behalf of the company.

(50.) From July, 1868, continuously, up to the present time, Gould, Fisk and Lane have really had the entire direction and control

of the financial affairs of the company, and the custody and disposition of all its funds, and have used such funds at their own will and pleasure, and made the same in great measure subservient to their own private gain, and used such moneys of the company very much as if the same belonged to themselves.

(51.) Large amounts of money belonging to the company have, for long periods of time, not been kept on deposit in the name of the company, nor been in any way kept separate as the property of the company, but have been retained in the hands of Gould, Fisk and Lane, or some or one of them, or in the hands of business firms with which they or some of them were connected, and in the hands of other persons, their confederates, and have been used by Gould, Fisk and Lane for their private gain, and have been by them, to a very great extent, put at hazard in speculations in stocks, gold and other things, and in other ventures, and thereby they have made to themselves great profits.

(52.) In respect to large amounts of the money of the company, Gould, Fisk and Lane have resorted to divers methods to cover up the truth in regard to their real use of such moneys. Among such devices, has been the one of pretending to keep the money of the company in a bank to its credit, while they, or some of them, or of their confederates on their behalf, have had the use of such moneys, or a great part thereof, or an amount corresponding thereto, in the shape of loans from or drafts on such bank, or in some other form.

(53.) Gould, Fisk and Lane, or some of them, have had the use of the moneys of the company to a large amount, and made large gains therefrom. At a certain time, they engaged in a stock speculation, wherein they purchased stock of the New York Central Railroad Company, to the amount of several millions of dollars, from which, upon a great and sudden rise in such stock, owing to an operation of which they had previous secret intelligence unknown to the public, they made many hundreds of thousands of dollars of profits. The substantial capital with which such speculation was carried on was derived from the funds of the company. The substantial capital for other speculations and financial operations of Gould, Fisk and Lane, or some of them, in the purchase or sale of other stocks, and of gold, and in speculating for a fall in the price of stocks and bonds, in operations of all which kinds they, or some of them, have from time to time engaged to a great extent, and to their great profit, has been in like manner derived from the funds of the company.

(54.) During the entire period, from the time when Gould, Fisk and Lane acquired a control in the affairs of the company, and more especially from the time when they acquired complete control in July, 1868, continuously, up to the present time, they have respectively, from time to time, and on a great many occasions, and habitually, taken advantage of and abused their trust as directors, officers and managers of the company, in the making of transactions on behalf of the company on one side, in which they or some of them were interested on the other side, and wherein they obtained great gains to themselves, to the loss of the company.

(55.) In some instances, such adverse private interests of theirs were in the shape of their being stockholders in the company thus entering into transactions with the Erie Railway Company. In other instances, the transaction purported to be made with some other person than themselves, and without any interest of theirs being apparent on the face of it, although such private interest really existed. In other instances, they, or some of them, received, for their own private uses, from the parties with whom the transaction was had, allowances by way of compensation for their influence as managers of the company, in causing the transaction to be entered into on its behalf. In other instances, they, or one of them, were openly sellers or lessors of property to the company, or purchasers of property from the company, or otherwise dealers with the company, and the terms on which the company was made to enter into the transactions were determined, on the part of the company, by them, as its controlling managers, notwithstanding their personal interest adverse to the company, and such terms were fixed beneficially to their private interest and unfavorably to the interests of the company.

(56.) Among such transactions, was the purchase, on behalf of the company, of a water front property on the Jersey shore, known as the "Weehawken Docks Property," for which the company was made to pay, or agree to pay, the excessive price of about $1,600,000, and expenditures on such property; the purchase of numerous other parcels of real estate in New Jersey, and expenditures thereon; and the lease to the company, at an extravagant rent, of the offices which it occupies in the building known as the "Grand Opera House," on the corner of Eighth avenue and Twenty-third street, in the city of New York, of which building Gould and Fisk, or one of them, claim to be owners or owner.

(57.) The purchase of the said Grand Opera House, and of a number of adjacent houses and lots, was made by Gould and Fisk, or one of them, for about $700,000, of which about $300,000 was paid in money, and the remaining $400,000 was secured by bond and mortgage on the premises. Thereupon, Gould, Fisk and Lane, as managers of the company, took a lease for a long term from Gould and Fisk individually, or one of them, of a portion of the building, to be occupied for the business offices of the company, and fixed the rent therefor at an amount far beyond

its true rental value, and much greater than could in any case with propriety be paid for business offices suitable for the occupation of the company, the rent so fixed being at the rate of $45,000 per year. The sum of $300,000 which was paid on account of the purchase money of such premises, or the greater portion thereof, was in fact taken by Gould and Fisk from the funds of the company, under their control as trustees, and such use of the funds of the company for their private purposes is by them pretended to be justified by the allegation that such amount was advanced by the company to them on account, and in anticipation, of the rent to become due from the company under such lease. A large additional amount of the money of the company has been expended by Gould, Fisk and Lane in furnishing, fitting up, and decorating the offices thus leased in an unsuitably extravagant style.

(58.) At the time of making such lease, the company was in the occupation of business offices at the foot of Duane street, in the city of New York, which is the starting point of the ferry which connects their road with the New York side, which offices had been occupied by them for many years, and were sufficient and suitable for their legitimate purposes. Such new offices are located in a portion of the city inconvenient for the legitimate purposes of their business. The location of the business offices of such a corporation in a building occupied, as is said Grand Opera House, for theatrical entertainments, under the management and direction of Fisk, one of the chief officers of the company, is unsuitable, discreditable, and prejudicial to the interests of the company, and the keeping of the books and records of the corporation in a building used as a theatre is unsafe and improper.

(59.) The taking of the lease, the advance of the company's money, and the expenditures in furnishing, fitting up and decorating the offices, were and are fraudulent breaches of trust on the part of Gould, Fisk and Lane, and, if suffered to remain in effect, would involve a loss to the company of nearly the whole amount of its funds thus applied and expended. The company and its bona fide shareholders are entitled to be relieved against such transaction, and against all such expenditures of its funds, and to have the lease cancelled, and to recover back from Gould and Fiske the whole amount advanced or paid on account of rent under the lease, and such portion of the sum paid by Gould and Fisk, on account of the purchase money of the premises, as was derived from the funds of the company, and all money of the company expended in fitting up or decorating the offices; and an equitable lien exists in favor of the company, and should be enforced in this suit, on behalf of the plaintiffs and the other shareholders, upon and against the Grand Opera House, and the land on which it stands, and the adjacent houses and lots which were embraced in the purchase by Gould and Fisk, or one of them.

(60.) During the period in which Gould, Fisk and Lane have had the control of the company, they have made great profits to themselves, and subjected the company to great loss, by a system of favoritism and discrimination in the rates of freight for transportation over said road of various articles, and especially petroleum, in cases where the articles thus transported belonged to Gould, Fisk and Lane, or one of them, or to firms or companies in which they or some of them had pecuniary interests, such discrimination being made, in many instances, in adjusting the charges for transportation of freight, or by making drawbacks or returns of portions of the freight nominally charged, to an extent which drove off other shippers from sending their freight by said road. The plaintiffs pray, that Gould, Fisk and Lane may be adjudged to account for and pay to the company, for the benefit of the plaintiffs and the other bona fide shareholders, the full amount of the profits thus obtained by themselves or their associates or confederates, and the full amount of the losses they have thus caused to the company.

(61.) Gould, Fisk and Lane, on many different occasions, since they acquired the control of the company, have wrongfully applied large amounts of the funds and property of the company to the acquisition of property, professedly for the company, which the company had no legal right so to acquire, and to large expenditures upon such property, and to purchasing, leasing, constructing, altering or improving, maintaining and operating other railroads, which it was not within the legal power of the company so to acquire, possess, maintain or operate, and to purchasing and dealing in the stock and bonds of other companies, professedly for account of the company, which it had not the legal right to purchase or deal in, and to rendering aid, on behalf of the company, to other companies, outside of the legal right of the company, and to divers other purposes not within the legal authority of the company. Thereby, large amounts of the funds of the company have been lost. All this has been done by Gould, Fisk and Lane in bad faith, and with full knowledge of such illegality, and most of the transactions were entered into by them without the sanction of the board of directors, unless in virtue of the pretended wholesale delegation by it of all its powers to the executive committee, which delegation is incompetent. Such transactions were almost entirely carried on by Gould, Fisk and Lane merely in virtue of the power which they practically possessed as such executive officers and executive committee, without the knowledge or assent of either the stockholders or the directors, with the exception of their confederates in the executive committee, and were manifestly wasteful when entered upon, and many of them were entered into

by Gould, Fisk and Lane by reason of private interests which they or some of them had in the subject matters affected thereby, and with a view to their own schemes of personal gain; and all such transactions were fraudulent breaches of trust on their part.

(62) The plaintiffs demand an accounting from Gould, Fisk and Lane in respect to such transactions and the company's funds applied thereto, and pray that they and each of them may be adjudged in this suit to pay to the company, for the benefit of the plaintiffs and the other bona fide shareholders, the amount of such funds which, upon such accounting, shall be found to have been lost by such transactions, and all losses and damages sustained by the company in consequence thereof.

(63.) During the greater portion of the time since Gould, Fisk and Lane acquired the substantial control of the company, they have been and are largely interested in a steamboat company styled the Narragansett Steamship Company, engaged in running steamboats on Long Island Sound, and they have had and still have the practical control of the affairs of that company, and they have, to a very large extent, used the funds and property of the Erie Railway Company for the benefit of such steamship company, and in aid of their own private acquisitions of stock therein, and otherwise in furtherance of their own private interests as shareholders therein. They have abused their trust as executive officers and executive committee of such railway company, to make and carry out in its name, and professedly on its behalf, arrangements with such steamship company, relating to the division of through freights on merchandise transported by the two companies, and other bargains between the two companies, which arrangements and bargains were prejudicial to the interests of such railway company, and greatly to the advantage of such steamship company, and of Gould, Fisk and Lane, in respect of their private interests therein.

(64.) The plaintiffs pray a full accounting in respect to such arrangements or bargains, and of all dealings of Gould, Fisk and Lane in the name of, or professedly on behalf of, such railway company with such steamship company, or with themselves in respect of their interest therein; and that Gould, Fisk and Lane may be adjudged, in this suit, to pay to such railway company, for the benefit of the plaintiffs and the other bona fide shareholders, the full amount of all loss or damage to it in consequence of the subject-matters of such accounting.

(65.) Gould, Fisk and Lane, since they have had the control of the company, have been accustomed to make large profits to themselves respectively, in connection with the furnishing of supplies to it, in the shape of discounts, brokerages, bonuses, and in other forms. They have been and are largely interested in coal mines, and in transportation lines connecting therewith, and have abused their trust as such executive officers and executive committee, by supplying to the company, for its uses, coal derived from such mines, at excessive prices, and have thereby made to themselves great profits, and subjected the company to great loss. In order to make room for such supplies of coal wherein they were themselves interested, they have forborne to make use of other sources of supply of coal previously and still within the control of the company, by means of which the coal required by the company could and should have been supplied to it at a cost much less than it was made to pay for the coal supplies wherein Gould, Fisk and Lane, or some of them, were interested. The plaintiffs demand from Gould, Fisk and Lane an accounting in respect of all these matters, and pray that they may be, in this suit, adjudged to pay to the company, for the benefit of the plaintiffs and the other bona fide shareholders, the amount of all profits derived by them from any of such sources, and the amount of all losses which they have inflicted upon the company by such transactions.

(66.) On the 20th of May, 1869, an act was passed by the legislature of New York, providing as follows: "No stockholder, director, or officer of either the New York Central Railroad Company, the Hudson River Railroad Company, or the Harlem Railroad Company, shall be a director or officer of the Erie Railway Company, and no stockholder, director, or officer of the latter company shall be a director or officer of either of the three first named companies. The board of directors in each of the said companies may so classify the members of such board, by lot or otherwise, that, as nearly as may be, one-fifth of their number shall go out of office at each annual election; and, at the next election of directors in each of the said companies, directors shall be voted for only in place of those whose terms shall then expire under the classification aforesaid." That act was procured to be passed by Gould, Fisk and Lane, with the co-operation of Tweed, who was a member of the legislature, they pretending therein to represent the company. The provision thereof purporting to authorize such a classification of the board of directors as to extend their terms of office to periods of from one to five years, instead of an uniform term of one year, was obtained by Gould, Fisk and Lane, for the sole purpose of enabling themselves to perpetuate for a long term their control of the company for their own private gain, despite the will of the stockholders, and the passage of the act was not applied for by either of the other three companies named therein, and neither of them has taken any action under the act.

(67.) Gould, Fisk and Lane illegally and fraudulently expended a large amount of the funds of the company, in order to ob-

tain the passage of such act. Its passage was obtained by means of the corrupt expenditure of large sums of money of the company, in influencing the action of members of the legislature in favor of the bill; and, also, large amounts* of the money of the company were used by Gould, Fisk and Lane by way of compensation to agents employed by them to promote the passage of the law. All these expenditures were fraudulent breaches of trust on their part.

(68.) The plaintiffs demand an accounting from Gould, Fisk and Lane for all moneys applied from the funds of the company to obtain or promote the passage of such act, and pray that they may, in this suit, be adjudged to pay to the company, for the benefit of the plaintiffs and the other shareholders, the whole amount of such money, with interest.

(69.) Since Gould, Fisk and Lane acquired control of the company, they or some of them have wrongfully and fraudulently put in circulation, and received the money for, a large amount of the bonds of said Long Dock Company, of which company the Erie Railway Company is substantially proprietor, which bonds had been previously taken up and extinguished by exchange therefor of stock of the Erie Railway Company. The reissue of such bonds was wholly illegitimate, and their amount was about $500,000.

(70.) Gould, Fisk and Lane controlled the annual election held for the election of directors of the company in October, 1869, by means substantially similar to those which they had successfully employed for the like purpose at the election in October, 1868. They were aided in wielding such voting power at the election in October, 1869, by the fact that, during the year then last preceding, a large amount of the new stock of the company created during that period had been issued to, or put in the names of, Gould, Fisk and Lane, or some of them, or their confederates, and in the name of said Smith, Gould, Martin & Co., and in the names of other persons or firms acting in concert with Gould, Fisk and Lane, or some of them, or their business firms, and whose proxies for voting on such stock, so long as it stood in the names of such parties, were subject to the control of Gould, Fisk and Lane, or one of them. Such shares of stock, at the time of the closing of the transfer books, preparatory to such election, were in fact no longer held by the persons in whose names the same stood, but had been previously sold and deliveries thereof made to the purchasers, by handing over the certificates, with blank powers of attorney to transfer, and which certificates passed from hand to hand as the representative of the stock without making any transfers in the books of the company.

(71.) A large amount of stock thus situated was, at the time of such election in 1869, held and owned in England and on the continent of Europe, where it is the custom to deal in American stocks of this character by delivery of the stock certificate with such blank power of attorney, executed by the person in whose name the stock was originally registered, the same passing from hand to hand in like manner with coupon bonds. At such election in 1869, Gould, Fisk and Lane voted upon this stock to a large amount, without any authority from its real owners, and without their knowledge or assent, by taking advantage of the circumstance of its having been originally registered in the names of Gould, Fisk and Lane, or some of them, or Smith, Gould, Martin & Co., and the other persons acting in concert with Gould, Fisk and Lane, or whose proxies were thus subject to their control.

(72.) It is alleged by Gould, Fisk and Lane, that, at such election in 1869, 355,000 votes were cast in favor of the board of directors who were then chosen, and that there was substantially a similar vote at the said annual meeting in favor of accepting the provisions of said act providing for a classification of the board of directors. The pretence of there having been any such amount of votes really cast by the actual holders of the stock thus voted on, or by any person thereunto authorized by such holders, is a fraud and fiction. In fact, the votes which were cast in favor of the election of the board and of the acceptance of the act, were almost all cast by Gould, Fisk and Lane, or one of them, or by persons acting under their control; and the voting power which they exercised on such shares was almost wholly derived by them from devices of the character before set forth, namely, voting upon stock which had been sold and delivered by handing over certificate and power in the names of the parties originally registered as shareholders, notwithstanding they had parted with and delivered such stock; voting upon stock borrowed or otherwise acquired for a very brief period, so that the same might stand in the names of Gould, Fisk and Lane, or their associates and confederates, on the day of closing the transfer books, although returned or parted with almost immediately afterwards, under the plan before set forth; and voting upon proxies obtained by purchase from parties who either owned the stock, or, as was usually the case, had it standing in their names without really owning it. The purchase money paid for such proxies was derived from the funds of the company, and the moneys by the use of which such shares had been caused to stand in the names of Gould, Fisk and Lane, or their associates or confederates, at the time of closing the transfer books, had been derived from the funds of the company. As to another large portion of the shares alleged to have been thus voted on, such shares had not been actually and legally issued when thus voted on, or

the prices or value thereof had not been paid to the company, and, if the same existed at all, they belonged to the company itself. The pretended voting at such election did not emanate from the actual proprietors of such shares to any considerable extent, and Gould, Fisk and Lane, by mere fraudulent devices, controlled the election, and thereat elected the board of directors selected purely by themselves and of their own will, without either themselves owning, or being the actual bona fide representatives of, any substantial proprietary interest in the stock of the company to any considerable amount. The omission of the bona fide stockholders to make any substantial opposition to the management of such election by Gould, Fisk and Lane, was mainly owing to the fact, that a great proportion of the stock had come to be held by European stockholders, who were not apprised of what was going on or intended to be done, or of the necessity for action on their part to defeat the fraudulent schemes of Gould, Fisk and Lane, and to a feeling on the part of American stockholders of the apparent hopelessness of any action on their part against Gould, Fisk and Lane, by reason of the voting power which they had accumulated in themselves by trick and device.

(73.) At the election held in October, 1869, under such circumstances, Gould, Fisk and Lane caused themselves and the following persons to be elected directors of the company for the ensuing year, namely: William M. Tweed, Alexander S. Diven, Justin D. White, John Ganson, O. W. Chapman, Horatio N. Otis, Charles G. Sisson, Abram Gould, Homer Ramsdell, Henry Thompson, John Hilton, Henry N. Smith, N. R. Simons, and George C. Hall. Almost immediately after such election, and on the same day on which it was held, a meeting of said board was held, and thereat there was made a pretended classification of said directors, in pretended pursuance of the act of May 21st, 1869, by which classification it was arranged that the terms of office of the said directors should be as follows: (1.) Expiring in October, 1870, Ramsdell, Sisson and White; (2.) expiring in October, 1871, Hilton, Simons and Hall; (3.) expiring in October, 1872, Ganson, Chapman and Thompson; (4) expiring in October, 1873, Diven, Smith, Abram Gould, and Otis; (5.) expiring in October, 1874, Jay Gould, Fisk, Tweed and Lane. This classification was prepared beforehand by Gould, Fisk and Lane. The board, in making the same, acted purely on their dictation. At the meeting at which it was made, several of the directors, including Ganson, Diven and Chapman, besides others, were absent. The postponement of such classification, until after an election of directors should be held, subsequent to the passing of the act, was a mere trick and device of Gould, Fisk and Lane, in order to present the false appearance of an approval by the stockholders of the plan of

classification, and to afford room for the allegation on the part of Gould Fisk and Lane, that the directors to whom long terms were assigned in the classification had been elected by the stockholders in view of such probable prolongation of their terms, and not merely for a single year. Gould, Fisk and Lane, in such postponement, also had reference to the consideration that thereby they could secure to themselves one year's additional length of term. They did not decide to postpone such classification until after the next annual election should be held, until they had ascertained that they had complete control of such election, and would have complete control of the board of directors to be elected thereat; and the pretence of there having been any substantial voice of the stockholders other than Gould, Fisk and Lane and their associates and confederates, in favor of such measure of classification, or of the election of the board thus pretended to be classified, is a mere sham.

(74.) Such pretended classification is without legal authority from the provisions of the act, and is of no legal force, because, by the act, the power of classification was given only to the board of directors holding office at the time of the passage of the act, and it is required that the classification, if made, shall be so made as that a portion only of the directors shall go out of office at the annual election held next after the passage of the act. But Gould, Fisk and Lane claim such classification to be valid, and intend to maintain it, and having, with their confederates, practically, the entire control of the company, as well in respect of holding its elections as of its other affairs, intend, at the next annual election to be held in October, 1870, not to permit a voting for a full board of directors, but only for three directors in place of those whose terms then expire under said pretended classification.

(75.) The plaintiffs, on behalf of themselves and the other bona fide shareholders, pray, that there may be an adjudication had, in this suit, of the invalidity of said pretended classification, and that, by the order of the court, the company, or those controlling its action in that behalf, may be directed to hold an election for a full board of seventeen directors at the stated time for holding the regular annual election in October, 1870, as if such pretended classification had never been made.

(76.) The board of directors elected by the procurement of Gould, Fisk and Lane, in October, 1869, is so constituted, and was designedly so made up by them, that it possesses no independent force for controlling them, but, as a board, in so far as it acts at all, is the mere instrument of their will, and, as matter of fact, in so far as it has acted at all, has acted, and does act, in entire subserviency to the personal, selfish and fraudulent schemes of Gould, Fisk and Lane. Although it may be true that, since the election of such new

board, meetings of the directors have been held more frequently than during the preceding year, yet, as well since the election of such new board as before, Gould, Fisk and Lane have had, and still have, practically, the absolute and unchecked control of the corporation and its funds, property and affairs. Tweed is in full accord with Gould, Fisk and Lane in their schemes and acts for private gain at the expense of the company and to the sacrifice of its interests, and has been, and is, pecuniarily interested in many of such schemes and acts. Smith was a copartner of Gould in the firm of Smith, Gould, Martin & Co. Several of the directors are salaried employees of the company, holding their offices at the pleasure of Gould, Fisk and Lane, or of Gould alone, and are under the influence and control of Gould, Fisk and Lane, and have only a nominal and trifling interest, if any, as shareholders of the company. Among the persons thus situated are White, the assistant treasurer; Hilton, the father of the transfer clerk, and himself a clerk or agent in some other capacity; Otis, the secretary of the company; and Hall, the supply agent of the company. Simons is in substantially like position or relation with Gould, Fisk and Lane, except that he is a salaried employee of the Narragansett Steamship Company, which is under the management, direction and control of Gould, Fisk and Lane, as aforesaid. As to some other members of the board, such as Ramsdell, Diven, Ganson, and some others, who are gentlemen of character, and of such position and capacity as to make them intrinsically proper directors for the company under ordinary circumstances, their independent action as such directors is compromised by reason of their being under some pledge that they would either support the policy of Gould or resign. If it be not so, they are in too small a minority to interpose any substantial check to the plans and operations of Gould, Fisk and Lane, supported, as they are, by an overwhelming majority of the board in their interest, and they are in such personal relations, or otherwise, with Gould, Fisk and Lane, as have prevented and will prevent them from in any way causing to be exerted the corporate power of the company to bring Gould, Fisk and Lane to account for their past misdeeds, and to compel restitution from them of the money which they have wrongfully and fraudulently obtained from the funds of the company; and some of the directors, not being residents of the city of New York, where the meetings of the board are held, do not attend such meetings.

(77.) Since the election of the new board of directors, in October, 1869, there has been, by the procurement of Gould, Fisk and Lane, a further increase of the common capital stock of the company to the extent of $5,000,000, or 50,000 shares of $100 each, making the whole share capital of the company over $80,000,-000. This has been accomplished by the issue, by Gould, Fisk and Lane, in the name and on behalf of the company, of its bonds for $5,000,000, containing a clause authorizing the holder of them to convert them into capital stock of the company, which conversion has been subsequently made.

(78.) The like allegations are substantially applicable to this increase of stock, and to the issue, negotiation and sale of the convertible bonds which were converted into such stock, and the receipt of the proceeds thereof by Gould, Fisk and Lane, and the application of such proceeds by them, as are before contained in the bill in respect of the convertible bonds and stock, to the amount of $32,000,000 or thereabouts, issued during the year ending September 30th, 1869, with this exception only, that there may have been obtained by Gould, Fisk and Lane some nominal approval by the board, who were in fact the mere instruments of their will, of some of their acts and doings in respect of the $5,000,000 of bonds and stock issued subsequently to the election in October, 1869.

(79.) The plaintiffs pray, that all the allegations of the bill in relation to the $32,000,-000 of stock and bonds, and the issue, sale and negotiation thereof, and the receipt of such proceeds by Gould, Fisk and Lane, or some of them, or under their control, and the application of such proceeds, and all the allegations of the bill in relation to the liability of Gould, Fisk and Lane in respect of such stock and bonds and their proceeds, may be regarded as repeated and made applicable to the last mentioned $5,000,000 of stock and bonds, and the negotiation, sale and issue thereof, and the receipt of the proceeds, and the liability of Gould, Fisk and Lane in respect of the same, with the like effect as if the same were repeated at large in connection with such $5,000,000 of stock and bonds and the proceeds thereof.

(80.) The plaintiffs believe that Gould, Fisk and Lane, unless restrained by injunction, will cause to be issued, in the name and on behalf of the company, further large amounts of its convertible bonds, and further large amounts of its stock, in pretended conversion of such bonds, and that such stock will be put on the market and sold to bona fide purchasers, and that Gould, Fisk and Lane will be guilty of the like mismanagement, waste and frauds in respect to such further issue of bonds and stock, and the proceeds thereof, that they have committed in relation to the convertible bonds and stock already issued since Gould became president of the company.

(81.) The credit and character of the company have become so greatly impaired, by reason of the mismanagement, waste and fraud of Gould, Fisk and Lane, that no further issues of its unsecured bonds or of its stock could now be made, except on most ruinous terms of discount, and not so much as one-third of the nominal amount of any such further issues of bonds or stock could

or can be obtained for the same in the market.

(82.) Within the few months last past, a large number of the shareholders of the company, resident in Great Britain, have become awakened to the necessity of action on their part, in concert with other bona fide shareholders, in order to wrest the control of the company from Gould, Fisk and Lane, and save it from utter bankruptcy, and it has been ascertained that over 450,000 shares of the stock of the company, representing a capital of more than $45,000,000, are held in Great Britain. There is, also, a large amount of the share capital of the company held on the continent of Europe, and the fact of intended adverse action against Gould, Fisk and Lane, on the part of the British shareholders, has become known to them, and is public and notorious.

(83.) In the course of the proceedings of the British shareholders, the fact has appeared, that upwards of 190,000 shares of the stock were held and owned by parties in Great Britain whose evidence of title was merely the stock certificate, with blank power of attorney for transfer, endorsed thereon, the stock standing registered on the company's books in the names of holders who had parted with it. A large portion of such stock was found to stand in the names of Smith, Gould, Martin & Company, and other persons and firms whose proxies for voting could be controlled or obtained by them through purchase or otherwise. The holders of a large amount of the stock thus owned in Great Britain, decided to have their stock transferred on the company's books to Robert Amadeus Heath and Henry Lewis Raphael, of London. Accordingly, the original certificates for a part of such stock, with the powers of attorney for the transfer thereof endorsed thereon, signed in due form by the parties in whose names the stock stood registered, and so filled up as to authorize the transfer of the stock represented by the certificates respectively to Robert A. Heath and Henry L. Raphael, were forwarded to L. Von Hoffman & Co., bankers, of the city of New York, in order that they might procure the transfer of such stock to be made accordingly.

(84.) On the 7th of February, 1870, L. Von Hoffman & Co., as agents of said Heath and Raphael, presented to the company, at its transfer office, such certificates, to the aggregate amount of 16,770 shares, with powers of attorney authorizing the transfer to said Heath and Raphael of the stock represented thereby, and demanded the transfer of such stock to said Heath and Raphael on the company's books, proposing to surrender the original stock·certificates on such transfer; but permission to make such transfer was refused by the company, although the transfer books were open, and transfers were being made by other persons.

(85.) L. Von Hoffman·& Co., as agents of said Heath & Raphael, have thus far been wholly unable to obtain a transfer of the 16,770 shares, or any part thereof, nor has any reason been given to them for not permitting such transfer, except a giving out, on the part of the company, that the transfer books are closed, and that an injunction against permitting transfers has been granted at the suit of some shareholder. The true motive for such closing of the transfer books· is the desire and determination, on the part of Gould, Fisk and Lane, to prevent foreign shareholders from causing their stock to be transferred into their own names, or the names of their nominees, and to keep not only the 190,000 shares and upwards of the stock of the company, held in Great Britain, but a very great amount of stock similarly situated, held upon the continent, in the names of the former holders, who are in a great measure confederates, friends and associates of Gould, Fisk and Lane, or persons whose proxies they can obtain by purchase or otherwise when needed. Such course of preventing transfers has been adopted, and is persisted in, by Gould, Fisk and Lane, with the design of frustrating, as far as may be, the efforts of the foreign stockholders to bring Gould, Fisk and Lane to justice for the wrongs and frauds which they have committed.

(86.) The pretended suit on behalf of a stockholder in the company against the company, wherein such pretended injunction against transfers was obtained, is a fraudulent and collusive suit in the interest of Gould, Fisk and Lane, set on foot and carried on by them and subject to their control.

(87.) At various times since Gould, Fisk and Lane acquired control over the affairs of the company, as well before as after July, 1868, they have wrongfully expended the moneys of the company, to a large amount, to obtain or influence legislative action by them desired, besides the particular legislation before specified, in carrying on suits set on foot by them, and in defending other suits wherein they were defendants or the defence whereof was for their personal benefit, and in numerous litigations, in some of which the company was a party and in others of which it was not, and for various purposes, in great proportion illegitimate, connected with such litigations, and to promote the objects which, by such litigations, they were seeking to obtain for their own private benefit. They have caused to be instituted and carried on by other persons, fraudulent and collusive suits, some of them purporting to be against the company, and some of them purporting to be against themselves or some of them, but all of which suits were in fact in their own interests. The expenses of such suits have been paid by Gould, Fisk and Lane out of the funds of the company, in fraud of the rights of the bona fide shareholders of the company, and include expenditures to a large amount on behalf of the pretended

plaintiffs in such suits, and of the parties purporting to be therein arrayed in hostility against the company or against Gould, Fisk and Lane, and expenditures purporting to have been made on behalf of the company.

(88.) In one instance, one Peter B. Sweeny, a person possessing great political influence, and whose aid in their schemes they desired to obtain, was nominally appointed receiver of a large fund belonging to the company, and, although no portion of such money ever passed into his hands, and he never performed any service as such receiver, and never became entitled to any commissions as such receiver, he was, on the discharge of his receivership, paid out of the funds of the company about $150,000, in pretended compensation for his services as such receiver, which payment was made with the concurrence of Gould, Fisk and Lane, and their assent to the payment was a fraudulent breach of trust on their part, for the loss from which resulting to the company they are personally responsible.

(89.) Gould, Fisk and Lane, since they acquired control of the company, have wrongfully and fraudulently expended a large amount of the funds of the company in influencing public elections and in aid of political partisanship, with the object of obtaining for themselves aid in their schemes of fraud.

(90.) The plaintiffs demand from Gould, Fisk and Lane a full accounting in respect of all expenditures of the company's money for the purposes before mentioned, and pray that, by the decree in this suit, Gould, Fisk and Lane may be adjudged to repay to the company, for the benefit of the plaintiffs and the other bona fide shareholders, the full amount of all such expenditures wrongfully made from its funds, with interest thereon.

(91.) By the official report made by the company to the state engineer and surveyor, for the year ending September 30th, 1868, purporting to be verified by the oath of Gould, as president, it appears that, during that year, the share capital was increased $21,191,000, the funded debt, $968,880, and the floating debt, $1,368,922.58; that, deducting $2,464,615.87, expended during that year for permanent improvements of and additions to said railroad, from such increase of stock and of funded and floating debt, there is a deficiency unaccounted for of over $21,000,000, arising from that year's operations of Gould, Fisk and Lane and their confederates, except that there is an illegal charge in said report of $4,774,220.40 for "discount on sale of convertible bonds," &c. The deficiency thus remaining unaccounted for from such year's operations, when added to the before mentioned deficiency for the year ending September 30th, 1869, shows an aggregate against Gould, Fisk and Lane and their confederates of between $40,000,000 and $50,000,000.

(92.) As the net result of the two years' management of the company by Gould, Fisk and Lane, they have reduced the net earnings of the company to the extent of more than $500,000 a year, while they have increased the amount of its share capital and funded and floating debt from $51,065,943.23 to $101,935,710, or to an extent of more than $50,000,000. Of this $50,000,000 they do not pretend to show more than between six and seven millions actually expended in improvements of and additions to the property, and they have not paid any dividends to the shareholders except a single dividend on the preferred stock in January, 1868, which was substantially paid out of surplus earnings accruing prior to the time when Gould and Fisk came into the management.

(93.) The public mind has become so fully impressed with the extent and degree of the disastrous consequences resulting and likely to result to the company from having Gould, Fisk and Lane to be its managers, that the market price of the preferred stock has recently fallen to about 42 or 43 per cent., and the market price of the common stock to about 25 per cent., and the market value of its mortgage bonds has very materially fallen. The company has not now any substantial credit for any considerable amount without giving collateral security. The credit of the company and the market prices of its stocks, of both classes, would be much lower than they are, were it not for the hope entertained that Gould, Fisk and Lane will be ousted from the control of the company's affairs, and brought to justice for the wrongs and frauds which they have committed.

(94.) It is essential to the protection of the rights and interests of the plaintiffs and the other bona fide shareholders of the company, and in order to avoid the further wrongful injury and depreciation of such interests of such shareholders, that Gould, Fisk and Lane, and the company, and all the officers, directors, managers and agents thereof, shall be enjoined and restrained, by the order of this court, from issuing any further convertible bonds of the company, and from issuing any further stock or certificates of stock of the company, otherwise than upon surrender and cancellation of certificates of existing valid stock of the company, upon transfer of such stock in the usual manner.

(95.) By reason of the matters before alleged, Gould, Fisk and Lane, respectively, are unfit, improper and unsafe persons to be trustees of the property of the company, or for the shareholders or creditors thereof, or to be any longer entrusted with the control of the property, funds or affairs of the company, or with the exercise of any of their powers as directors, executive officers or executive committee of the company, and it is essential to the preservation of the rights and interests of the plaintiffs and the other bona fide shareholders, that they should be at once ousted from all control about the property, funds or affairs of the corporation, and enjoined from exercising any of their powers as

directors, executive officers or executive committee, or from in any wise interfering with the property, funds or affairs of the company.

(96.) By reason of the power which Gould, Fisk and Lane now practically exercise over the property of the company and its books, accounts and documents, and of the influence they exercise over the subordinate officers and employees of the company, in whom rest, in great measure, the knowledge and information necessary to be obtained in relation to the details of the past doings of Gould, Fisk and Lane, in respect to the company's affairs, it is and will be impracticable to obtain any fair investigation of the details of such transactions, until Gould, Fisk and Lane shall be wholly ousted from their power and control and deprived of their influence.

(97.) Unless and until Gould, Fisk and Lane shall be wholly excluded from the management and control of the affairs of the company, and such management shall be placed in the hands of persons possessing integrity and independence of character, and that high degree of competence, experience, and skill which is requisite for the adequate and proper management of so great a concern, the rights and interests of the plaintiffs and the other bona fide stockholders will be constantly exposed to further and continual depreciation, injury and loss; and, if Gould, Fisk and Lane be very much longer permitted to remain in the control of the company, no other result can be reasonably looked for than the utter wreck and ruin of the whole interest of the holders of the common stock, and the interest of the holders of the preferred stock will also thereby be put in great jeopardy.

(98.) If the control of Gould, Fisk and Lane be permitted to continue even until the next annual election, there will be thereby occasioned great and irreparable loss to the plaintiffs and the other bona fide shareholders, even if by that time Gould, Fisk and Lane shall be legally forced to allow the present owners of the stock which stands in the names of former holders, whose proxies Gould, Fisk and Lane can control, to transfer such stock into their own names, or the names of their nominees, and even although, before the time for the next annual election, there shall have been a competent legal adjudication of the invalidity of the said pretended classification of directors, so as to require an entire board to be elected in October, 1870; and, unless both those contingencies shall be determined favorably to the interests of the plaintiffs and the other bona fide shareholders, prior to the time for the next annual election, the coming of such time would afford little or no opportunity of redress for the bona fide shareholders against the still further continuance of the wrongs and frauds of Gould, Fisk and Lane.

(99.) By reason of the composition of the present board of directors, who were so put in office by Gould, Fisk and Lane, in October, 1869, and their confederacy with, and subjec-tion to, Gould, Fisk and Lane, and the other circumstances before stated in the bill in that behalf, there can be no adequate and proper management of the affairs of the company under the administration of that board of directors, even after the exclusion of Gould, Fisk and Lane, or under the administration of executive officers or agents likely to be selected by them in place of Gould, Fisk and Lane, and in place of the present agents and employees heretofore selected by Gould, Fisk and Lane; and, in order to the proper management of the affairs of the company, and the preservation of the rights and interests of the plaintiffs and the other bona fide shareholders, until a new board of directors can be elected by the shareholders at a regular election, honestly and fairly conducted, it is essential that a receiver should be appointed by this court to take charge of the property, funds and affairs of the corporation, including the railroad and appurtenances, and to manage and carry on the same under the order and direction of this court.

(100.) The several rights and equities, claims and demands, in favor of the company, which are set forth in the bill, cannot be enforced by suit brought in the name and in behalf of the company, for the reason that the control of the company is now wholly in the hands of Gould, Fisk and Lane, and the plaintiffs are wholly unable to procure the bringing of a suit in the name of the company, as plaintiffs, against them.

(101.) The holders of the preferred stock, as well as the holders of the common stock, of the company are very numerous, as well as constantly changing, and it is impracticable to make them parties, either plaintiff or defendant, in this suit, and the bill is, therefore, filed on behalf of the plaintiffs and all other bona fide shareholders who shall elect to unite in the suit and contribute to the expenses thereof.

The bill asked that the answer might be without oath, and expressly waived an answer on oath. It also prayed: (1.) That Gould, Fisk and Lane, and each of them, may be compelled to render an account of all their trust and management in respect of the property, funds and affairs of the company, since their election as directors in October, 1867, and of all moneys and funds belonging to the company, which, since that time, have come into the hands or under the control of them, or either of them, and of the disposition of all such moneys; and also an account in respect of all profits, benefits, gains and advantages which, during such period, they, or either of them, have derived to themselves from the property, funds or credit of the company, or at its expense, or in anywise by reason of the trust vested in them as executive officers, executive committee, or directors of the company, and in respect of all losses, damages and injuries to which, during such period, they have subjected, or caused to be subjected, the company, and in respect of all

the allegations and charges contained in the bill. (2.) That Gould, Fisk and Lane may, by the decree in this suit, be adjudged to make payment and compensation to the company, for the benefit of the plaintiffs and the other bona fide shareholders, to the full extent of all such profits, benefits, gains and advantages, and of all such damages, losses and injuries. (3.) That, by such decree, Gould, Fisk and Lane may be ousted from all management, control or power in or about the property, funds or affairs of the corporation, and enjoined from exercising any powers as directors, executive officers, or executive committees thereof, and in any way interfering with the property, funds or affairs of the company. (4.) That Gould, Fisk and Lane, and the company, and all its officers, directors, managers and agents, may be enjoined and restrained, by this court, from issuing any further convertible bonds of the company, and from issuing any further stock or certificates of stock of the company, otherwise than upon surrender and cancellation of certificates of existing valid stock of the company, upon transfer of such stock in the usual manner. (5.) That, by order of this court, in this suit, a receiver may be appointed to take charge of the property, funds and affairs of the company, including its railroad and appurtenances, and to manage and carry on the same, under the order and subject to the direction of this court, in such manner, and for and during such period, as, under the circumstances, may seem proper. (6.) That, pending this suit, Gould, Fisk and Lane, and the company, and its officers, directors, managers and agents, may be enjoined and restrained from issuing or delivering any bonds or obligations of the company, purporting to confer upon the holder thereof any right of converting the same into stock of the company, or of receiving any such stock in exchange therefor, and from issuing, putting in circulation, delivering or aiding in giving currency to, any stock or certificates purporting to be for stock of the company, otherwise than on the surrender and cancellation of genuine certificates of existing shares of stock of the company, now standing registered upon its books, on transfer of such stock in the usual manner. (7.) That the plaintiffs may, pending this suit, have such writ of injunction enjoining and restraining Gould, Fisk and Lane, and each of them, and their attorneys and agents, from exercising any power or authority, and from doing any act as directors, or executive officers, or executive committee of the company, and from interfering with any of the property, funds or affairs of the company, and from disposing of any of such property or funds of the company, and from removing, or suffering or permitting to be removed, from the offices of the company, any of the books, papers, securities or funds of the company, and from secreting or concealing, or suffering to be secreted or concealed, any such books, papers, securities or funds. (8.) That the plaintiffs may have such further or such other order, relief and decree in the premises as may be equitable.

The demurrer of the company set forth, as causes of demurrer to the whole bill: (1.) That the plaintiffs have not, in and by their bill, made or stated such a case as doth or ought to entitle them to any such discovery or relief as is thereby sought and prayed for from or against such defendant. (2.) That it appears by the bill, that John S. Eldridge, Henry Thompson, Levi Underwood, Josiah Bardwell, Eben D. Jordan and James S. Whitney are necessary parties to the bill, inasmuch as it is therein stated, that all of said persons were confederated to secure control of the company by illegitimate means for purposes of their private gain, which purposes were accomplished, and which purposes are made a part of the grounds of the bill; and that the Boston, Hartford and Erie Railroad Company is a necessary party to the bill, inasmuch as it is therein stated that the said company received a large amount of money from the Erie Railway Company, in violation of the corporate powers of the latter company, in collusion with Gould, Fisk and Lane; and that Richard Schell and Cornelius Vanderbilt are necessary parties to the bill, inasmuch as it is therein stated that they received large amounts of money from the company by fraud and combination with Gould, Fisk and Lane; and that the Narragansett Steamship Company is a necessary party to the bill, inasmuch as it is therein stated that the said company has acquired wrongful gains from the Erie Railway Company by collusion with Gould, Fisk and Lane, of which gains an accounting is demanded by the bill; and that William M. Tweed, Alexander S. Diven, Justin D. White, John Ganson, O. W. Chapman, Horatio N. Otis, Charles G. Sisson, Abram Gould, Homer Ramsdell, Henry Thompson, John Hilton, Henry N. Smith, M. R. Simons and George C. Hall are necessary parties to the bill, inasmuch as it is therein stated, that those persons, together with Gould, Fisk and Lane, were elected directors of the company in October, 1869, and divided themselves into five classes, holding offices for different terms, which classification the bill prays to have set aside, and thus to shorten the term of fourteen of the said directors; and that the persons last named appear by the bill to be still directors of the company; and that, in respect to Tweed, it is alleged by the bill that he is in full accord with Gould, Fisk and Lane, in schemes of private gain at the expense of the company, and is personally interested therein. (3.) That the plaintiffs, in and by their bill, have expressly waived an answer by such defendant in such manner and form as alone is known to and recognized by the rules and practice of this court, and so such defendant is not bound to answer the bill, but the same should be dismissed.

The separate demurrers of the other three defendants respectively were the same in tenor and effect as the demurrer of the company.

William M. Evarts and Ebenezer R. Hoar, for plaintiffs.

Benjamin R. Curtis and David Dudley Field, for defendants.

BLATCHFORD, District Judge. It is to be noted, that the demurrers are to the whole bill, and the causes of demurrer set forth are set forth as causes of demurrer to the whole bill, and there is no demurrer to any separate part of the bill. The first cause of demurrer set forth is a general want of equity in the bill, and an absence of title therein to any of the relief prayed for. The second cause of demurrer is the want of parties, the absent and necessary parties being specified. The third cause of demurrer is the waiver of an answer on oath.

Under the first cause of demurrer, the defendants advance the propositions: (1.) That the bill states no cause of action, even in favor of the plaintiffs other than Burt. (2.) That Burt is improperly a plaintiff, because he is not a stockholder in the company. (3.) That if, on that ground, the bill cannot be sustained on behalf of Burt, it cannot be sustained on behalf of any of the plaintiffs. The principal discussion, on the hearing, was on the first of these three propositions.

The argument on the part of the defendants, succinctly stated, is, that the charges in the bill amount to allegations that Gould, Fisk and Lane, holding such offices of trust and confidence under the company, misused, in breach of their trust, and for their own profit, powers actually confided to them by the corporation, and usurped powers not granted to them by the corporation, and, in breach of their duty, used such powers for their own profit; that the corporation alone can come into court, as plaintiff, and challenge an act that is within the limit of the corporate powers of the corporation; that a stockholder in a corporation can come into court, as plaintiff, to restrain the corporation from doing an illegal act which it is about to do, joining as parties defendant the corporation and directors whom he accuses of a breach of trust; that, where a corporation, or its governing body, has actually done illegal acts, with injurious consequences, a stockholder, before he can come into court and assert the title of the corporation, must show that he has exhausted all means to set the corporate body in motion; that, in this case, there is no allegation in the bill showing any corporate act, either within or without the powers of the corporation, but only allegations of misuse of corporate powers by Gould, Fisk and Lane, and usurpation by them of powers beyond the corporate powers; that it is within the power of the corporation to call them to account for such misuse and usurpa-

tion; that the bill is brought to enforce such corporate right; that it must fail, unless the plaintiffs have laid a sufficient legal foundation for taking away such power from the board of directors of the corporation, and vesting it in the plaintiffs; that the bill must show that the directors of the corporation have committed a breach of trust, by not pursuing the remedy which the plaintiffs ask for; that, as the bill does not show any application to the board of directors to bring a suit for the relief sought by this suit, and a refusal or neglect by such board thereafter to bring such suit, it must show a sufficient excuse for not making such application, by averments from which it can be legally concluded that, if such board had been so applied to, it would have been guilty of the breach of trust of not bringing such suit; and that, within these principles, the foundation is not laid for any title in the plaintiffs to bring this suit.

The doctrines of equity jurisprudence involved in these propositions on the part of the defendants are not controverted by the plaintiffs. The difference between the parties arises in the application of such doctrines to this case.

A text-book of authority on the subject of corporations lays down the law thus, on the subject under consideration: "The general rule is, that a suit brought for the purpose of compelling the ministerial officers of a private corporation to account for breach of official duty, or misapplication of corporate funds, should be brought in the name of the corporation, and cannot be brought in the name of the stockholders, or some of them. * * * And, generally, where there has been a waste or misapplication of the corporate funds, by the officers or agents of the company, a suit in equity may be brought by, and in the name of, the corporation, to compel them to account for such waste or misapplication, directors being regarded as trustees of the stockholders, and subject to the obligations and disabilities incidental to that relation. But, as a court of equity never permits a wrong to go unredressed merely for the sake of form, if it appear that the directors of a corporation refuse in such case to prosecute, by collusion with those who had made themselves answerable by their negligence or fraud, or if the corporation is still under the control of those who must be the defendants in the suit, the stockholders, who are the real parties in interest, will be permitted to file a bill in their own names, making the corporation a party defendant." Ang. & A. Corp. § 312. As authorities for these views, the authors cite, among other cases, those of Hersey v. Veazie, 24 Me. 12; Hodges v. New England Screw Co., 1 R. I. 312; and Robinson v. Smith, 3 Paige, 222, 233.

The leading case on the subject in the courts of this state is that of Robinson v. Smith, in 1832, (above cited). In that case, Chancellor Walworth declares it to be the

law of this state, that the directors of a joint-stock corporation, who wilfully abuse their trust or misapply the funds of the company, by which a loss is sustained, are personally liable, as trustees, to make good that loss; that they are equally liable if they suffer the corporate funds or property to be lost or wasted by gross negligence and inattention to the duties of their trust; that the directors of joint-stock corporations are the trustees or managing partners, and the stockholders are the cestuis que trust, and have a joint interest in all the property and effects of the corporation; and that no injury the stockholders may sustain by a fraudulent breach of trust, can, upon the general principles of equity, be suffered to pass without a remedy. He adds: "Generally, where there has been a waste or misapplication of the corporate funds by the officers or agents of the company, a suit to compel them to account for such waste or misapplication should be in the name of the corporation. But, as this court never permits a wrong to go unredressed merely for the sake of form, if it appeared that the directors of the corporation refused to prosecute, by collusion with those who had made themselves answerable, by their negligence or fraud, or if the corporation was still under the control of those who must be made the defendants in the suit, the stockholders, who are the real parties in interest, would be permitted to file a bill in their own names, making the corporation a party defendant. And, if the stockholders were so numerous as to render it impossible or very inconvenient to bring them all before the court, a part might file a bill in behalf of themselves and all others standing in the same situation."

In the case of Cunningham v. Pell (1836) 5 Paige, 607, the liability of the directors of a corporation to the parties injured by a fraudulent breach of trust was again asserted, and it was held not to be necessary to make all the fraudulent directors parties to a bill filed for the purpose of obtaining satisfaction for a fraudulent breach of trust.

In the case of Hodges v. New England Screw Co. (1850) 1 R. I. 312, a stockholder in a corporation brought a bill in equity against the corporation and its directors, charging various acts of mismanagement and fraud and a violation of the charter of the corporation. The defendants took the ground that the wrong, if any, was a wrong to the corporation, and that the suit should have been brought by the corporation. In reply to this it was contended for the plaintiff, that the application of the funds of a corporation, by its directors, to purposes not authorized by its charter, was a breach of trust cognizable by a court of equity; and that, where the corporation was in the control of the directors who had committed the breach of trust, a stockholder might bring his bill against them and make the corporation a party. The court held, that the directors of the cor-

poration were liable in equity, as trustees, for a fraudulent breach of trust; that the primary party to sue for such fraudulent breach of trust was the corporation, as being the party injured, but, if the corporation refused to sue, or was under the control of the guilty directors, the stockholders might sue; that, in the case then before the court, the defendants who were charged with the fraudulent breach of trust were still the directors of the corporation, and still controlled its action; that, therefore, the bill, so far as it sought a remedy against directors, came within the settled jurisdiction of the court; and that the plaintiff was, under the circumstances, the proper party to sue.

In the case of March v. Eastern R. Co. (1860) 40 N. H. 548, five stockholders in the Eastern Railroad in New Hampshire, a New Hampshire corporation, brought a bill in equity, in behalf of themselves and all other stockholders in the corporation who should come in and join in the suit, against the corporation, and its five directors, and a Massachusetts railroad corporation, setting forth a fraudulent combination between such directors and the officers of the Massachusetts corporation, to defraud the plaintiffs, as stockholders in the New Hampshire corporation. The court sustained the bill. It says: "It is now no longer doubted, either in England or the United States, that courts of equity in both have a jurisdiction over corporations, at the instance of one or more of their members, to apply preventive remedies, by injunction, to restrain those who administer them from doing acts which would amount to a violation of charters, or to prevent any misapplication of their capital or profits which might result in lessening the dividends of stockholders, or the value of their shares, as either may be protected by the franchises of a corporation, if the acts intended to be done create what is in law denominated a breach of trust. And the jurisdiction extends to inquire into and to enjoin, as the case may require that to be done, any proceedings by individuals, in whatever character they may profess to act, if the subject of complaint is an implied violation of a corporate franchise, or the denial of a right growing out of it, for which there is not an adequate remedy at law." For this principle the court cites, as authority, the case of Dodge v. Woolsey, 18 How. [59 U. S.] 341. It also refers, with approval, to the case of Robinson v. Smith (before cited), as establishing the principles before referred to as laid down in that case.

In the case of Peabody v. Flint (1863) 6 Allen, 52, two stockholders in the Lowell and Salem Railroad Company, for themselves and in behalf of the other stockholders, brought a bill in equity against certain directors and agents of said company, and of the Lowell and Lawrence Railroad Company, and others, charging various acts of conspiracy and fraud, by which the interests of the stock-

holders in the former company were preju-diced and sacrificed for the benefit of the latter company. The bill was demurred to, and it was argued for the defendants, that the bill could not be sustained; that the only possible remedy for the stockholders was to bring a bill asking for an order to compel the corporation and its officers to bring an action in favor of the corporation; that, be-fore that could be done, the corporation must have fraudulently refused, on request, to bring such action; and that no such averment was made in the bill. In its opinion, the court says: "The principal ground of de-murrer relied on by the defendants is, that the plaintiffs have not, and never had, any remedy for such injuries as they complain of; that, conceding the truth of the allega-tions, that the directors of the Salem and Lowell Railroad Company, either by them-selves, or with the consent and connivance of a majority of their stockholders, com-bined, either among themselves, or with the Lowell and Lawrence Railroad Company, or its directors, or with any of the other de-fendants, to defraud a minority of the stock-holders of the Salem and Lowell Railroad Company, and, in pursuance of this com-bination, did the acts alleged, and so dealt and managed as to destroy the value of the stock as set forth, yet the only relief which the minority can have is the very imperfect one of selling out their stock for what it will bring in market." The court repudiates this doctrine as leading to the encouragement of frauds in the management of corporations, and, referring to the principle, that the inter-est of the stockholders in a joint-stock cor-poration is an equitable interest, says: "If there is an equitable interest, there must re-sult from it equitable relations and equitable rights; and these rights may be enforced by equitable remedies. As between the corpo-ration itself and its officers, it was long since held, that they were trustees, and that a court of equity would hold them responsible for every breach of trust. The corporation itself holds its property as trustee for the stockholders, who have a joint interest in all its property and effects, and each of whom is related to it as cestui que trust. The cor-poration may call its officers to account if they willfully abuse their trust, or misapply the funds of the company; and, if it refuses to sue, or is still under the control of those who must be made defendants in the suit, the stockholders, who are the real parties in interest, may file a bill in their own names, making the corporation a party defendant; or, a part of them may file a bill in behalf of themselves and all others standing in the same relation, if convenience requires it. If other parties have participated with the offi-cers in such proceedings, they may, accord-ing to the established principles of equity pleading, be joined as parties. In the dis-covery of frauds, and in furnishing remedies to parties defrauded, equity does not suffer

technicalities to stand in its way, but seizes upon the substance of the case, and holds all parties to their just responsibility, following trust property into the hands of remote gran-tees and purchasers who have taken it, with notice of a trust, in order to subject it to the trust. The objection, therefore, that a court of equity has no power to furnish a remedy in a case of this character, is untenable."

Several cases were cited and relied on by the defendants in support of the demurrers in this case, especially the two English cases of Foss v. Harbottle (1843) 2 Hare, 461, and Mozley v. Alston (1847) 1 Phill. 790, the first before Sir James Wigram, and the second be-fore Lord Cottenham. In regard to those cases, it is apparent, from the opinion of the court in the case of Gray v. Lewis (1869) L. R. 8 Eq. 526, 541, that those cases are re-garded by the court of chancery in England only as holding, that a shareholder cannot maintain a suit on behalf of himself and the other shareholders, where the acts com-plained of are capable of being released or confirmed by the corporation, and that, in such a case, the corporation itself is the only proper plaintiff; but that those cases are not regarded as holding, and that it is not the law in the court of chancery in England, at this day, that a shareholder cannot maintain a suit on behalf of himself and the other share-holders where the acts complained of are ul-tra vires of the corporation. The case of Gray v. Lewis also holds, that where the ground of complaint is that the powers of the corporation have been exceeded, a bill may properly be filed by a shareholder to assert the rights of himself and his co-share-holders against the illegal acts of the corpo-ration.

Such, also, is the principle established by the decision of the present lord chancellor of England, when vice-chancellor, Wood, in the case of Atwool v. Merryweather (1868) L. R. 5 Eq. 464, note.

The case of Hoole v. Great Western Ry. Co. (1867) 3 Ch. App. 262, was a case before the same vice-chancellor. A shareholder in a corporation, on behalf of himself and all his co-shareholders who were not defendants, filed a bill in equity against the corporation, its directors and its secretary, alleging that the corporation had acted ultra vires in issu-ing certain shares, and was about further to act ultra vires in issuing certain other shares, and praying for a declaration that the cor-poration was not entitled to issue such shares, and that those which had been issued be cancelled, and that the corporation be en-joined from paying dividends on those which had been issued, and that the corporation and its directors be enjoined from issuing any more of such shares. The corporation demurred to the bill for want of equity, and the vice-chancellor overruled the demurrer. He also enjoined the corporation from issu-ing further shares, and gave liberty to apply for an injunction, in case a dividend should

be declared on shares which had been already issued. The corporation appealed, and the appeal was heard before the lords justices, holding the court of appeal in chancery. Lord Justice Lord Cairns, while holding that the issuing of the shares was believed by all the parties concerned in issuing them to be most advantageous to the corporation, and to every person concerned, and regretting that the arrangement did not meet with the unanimous assent of all the shareholders, declared that if the issuing of the shares was ultra vires, and therefore illegal, any member of the corporation might dissent from it, and had a right to appeal to a court of equity to be protected against its effects. On the question of power, he held that the issuing of the shares was ultra vires, that the equity of the bill was clear, and that the order for the injunction, as regarded equity, was entirely correct. He also declared, that he had a very strong opinion, that any corporator or member of a company may maintain a bill against the corporation and the executive to restrain them from doing an act which is ultra vires, and therefore illegal, without making the bill a bill on behalf of other shareholders. Viewing the prayer of the bill in regard to cancelling the shares issued not as praying for relief affecting the individuals holding the shares, as purchasers or otherwise, but as a request to the court to order the executive of the company to take steps under their own responsibility and at their own expense to cancel or get in the stock improperly issued, he held, that, in regard to the prayer for an injunction against paying dividends on the shares already issued, the holders of such shares were sufficiently represented in the suit by one of the defendants, who was a director, and held some of such shares. He sustained the bill and the order for the injunction. Lord Justice Rolt, in his opinion, said that it was possible and very probable, that the arrangement proposed by the issuing of the shares was very beneficial; that if it were within the power of the corporation, the decision of the governing body might, upon the principle adopted by the court, in Mozley v. Alston, and Foss v. Harbottle, be held to govern; but that, if the scheme proposed was altogether beyond their power, the court had nothing to do with the merits, but had only to see that the corporation did not exceed its powers. He held, that the scheme was beyond the powers of the corporation, and that the order overruling the demurrer, and the order granting the injunction, were right. He added: "If the act complained of is illegal, as I think it is, I do not at present see why any single shareholder should not be at liberty to file a bill to restrain the company from exceeding their powers. * * * If one individual having an interest complains of an act of the whole company, or the executive of the whole company, as being illegal, there is, as a general rule, no necessity for

any other shareholders being present." See, also, Bloxam v. Metropolitan Ry. Co. (1868) 3 Ch. App. 337, before Vice-Chancellor Wood, and, on appeal, before the lord chancellor, Lord Chelmsford.

The cases of Foss v. Harbottle and Mozley v. Alston were cited and relied on by the defendants in the case of Gregory v. Patchett (1864) 33 Beav. 595, in which case the master of the rolls, Sir John Romilly, says, that he has examined the various cases on the subject, and the result of them is, that, in matters strictly relating to the internal management of a company, even though the court should come to the conclusion that the course adopted is not warranted by the terms of the charter, the court will not interfere, even though the minority should have summoned a meeting of all the shareholders, and the majority should have persisted in the course complained of, (the general body of the shareholders, at meetings duly convened for the purpose, being the ultimate governing body); but that, if the measures adopted are plainly beyond the powers of the company, and are inconsistent with the objects for which the company was constituted, the court will, at the instance of the minority, interpose to prevent the performance of the act complained of, and it will do so whether an appeal has or has not been made by the minority to the shareholders generally.

The following cases in courts in the United States were cited and relied on by the defendants: Hersey v. Veazie, 24 Me. 9; Dodge v. Woolsey, 18 How. [59 U. S.] 331; Allen v. Curtis, 26 Conn. 456; Bronson v. La Crosse R. Co., 2 Wall. [69 U. S.] 283; Memphis City v. Dean, 8 Wall. [75 U. S.] 64; and Samuel v. Holladay [Case No. 12,288].

The case of Hersey v. Veazie (1844) was this: Two stockholders in a corporation filed a bill in equity against one Veazie, the collector of tolls, treasurer and agent of the corporation, charging him with having abstracted the funds of the corporation, and with having fraudulently sold and received the pay for the franchise of the corporation, and praying that he might account for and pay to the plaintiffs their proportion of the funds of the corporation in his hands. The bill was demurred to. The court, in its opinion, allowing the demurrer, adverts to the fact that there was no allegation in the bill that the corporation had refused to call the defendant to account, or had acted collusively with him, except as represented by him as agent, or that a corporate meeting could not be obtained, it being the law of the state that a minority of the shareholders could cause a meeting of the corporation to be called; and that, therefore, it did not appear by the bill that the corporation had not the power and the disposition to settle with the defendant according to its own pleasure. The fact was also noted, that the corporation was not a defendant, and that the wrongs were primarily committed against the corporation.

Still, the court says: "If the plaintiffs have been injured by these fraudulent acts, they should have taken measures to have the corporation obtain redress for them, and through its action have obtained their own redress. If, after proper exertions made, it had been found incapable of doing it, or had improperly or collusively refused to do it, they might perhaps have obtained redress by making it a party defendant." It is to be remarked, that, in that case, there was no attempt in the bill to show any state of facts warranting a departure from the general principle that the corporation itself, as the injured party, should sue as plaintiff.

In the case of Dodge v. Woolsey (1855) the court uses the language hereinbefore quoted from the opinion of the court in March v. Eastern R. Co. Woolsey, a shareholder in a corporation, brought a bill in equity against the corporation and its directors and Dodge, a state tax collector, to enjoin the collection of a state tax from the corporation, alleging that the tax was illegal, and that he had requested the directors of the corporation to take measures by suit or otherwise to prevent the collection of the tax, and that they had refused to do so. He obtained from the circuit court the relief he asked. The case was taken to the supreme court by appeal. That court lays down the principles before referred to, in regard to the jurisdiction of a court of equity over a corporation, at the instance of a shareholder, to restrain a violation of its charter or any other act amounting to a breach of trust. It also refers with approbation, to the view that it is a breach of trust towards a shareholder in a joint-stock corporation, to divert its funds, without his consent, from the purposes prescribed by its charter, though the misapplication be sanctioned by the votes of a majority, and that, therefore, he may file a bill in equity, in his own behalf, against the corporation, to restrain such diversion or misapplication; and to the view, that a corporation has no power to apply its profits, any more than its capital, to objects not contemplated by its charter, and that, therefore, a shareholder may maintain a bill in equity against the directors, and compel the corporation to refund any of the profits thus improperly applied. These views it cites from Ang. & A. Corp. §§ 391, 392. It also quotes the following remarks from the same work (sections 391, 393), as stating properly the result of the cases: "That, in cases where the legal remedy against a corporation is inadequate, a court of equity will interfere, is well settled; and there are cases in which a bill in equity will lie against a corporation by one of its members." "Although the result of the authorities clearly is, that, in a corporation acting within the scope of, and in obedience to, the provisions of its constitution, the will of the majority, duly expressed at a legally constituted meeting, must govern, yet, beyond the limits of the act of incorporation, the will of the majority cannot make an act valid; and the powers of a court of equity may be put in motion at the instance of a single shareholder, if he can show that the corporation are employing their statutory powers for the accomplishment of purposes not within the scope of their institution. Yet it is to be observed, that there is an important distinction between this class of cases and those in which there is no breach of trust, but only error and misapprehension, or simple negligence on the part of the directors." Holding, then, that the refusal of the directors of the corporation, on request, to take measures to test the question of the legality of the tax referred to was a breach of trust, it also held, that such breach of trust amounted to an illegal application of the profits due to the stockholders of the corporation, by suffering them to be applied to pay the tax, into which a court of equity would inquire, to prevent its being made, and that the directors were properly made parties to the bill, because they had committed such breach of trust. This decision is very far from sustaining the principle for which it is invoked by the defendants, namely, that no suit can be brought by a stockholder unless he avers and proves that he has applied to the corporation to bring the suit itself, and it has refused.

The case of Allen v. Curtis, in 1857, was a suit at law and not one in equity, brought by a stockholder in a corporation against its directors, to recover damages for the destruction of the value of his stock by the fraudulent acts of the defendants as such directors. The declaration was demurred to and the demurrer was sustained, the objection being taken, in support of the demurrer, that the remedy was in equity and not at law, and that the corporation must be a party. The court held that such an action at law, by a stockholder, would not lie, adding, that if, for any cause, the corporation was unable to bring suit, or if, through fraud and collusion, the directors refused or neglected to bring suit in the corporate name, and would not seek redress, a ground would be laid for invoking the interposition of a court of equity.

The case of Bronson v. La Crosse R. Co. (1863) holds, that where the directors of a corporation, for the fraudulent purpose of sacrificing the interests of the stockholders, refuse to appear and defend a suit in equity against the corporation, the court, in its discretion, will permit a stockholder to become a party defendant, for the purpose of protecting his own interests against unfounded or illegal claims against the corporation, and will also permit him to appear on behalf of other stockholders, who may desire to join him in the defence. The court, in its opinion, says, that the remedy is an extreme one, and should be admitted by the court with hesitation and caution, but that it grows out of the necessity of the case, and may be the only remedy to prevent a flagrant wrong, but that

it would be a reproach to the law, and especially in a court of equity, if, in the case referred to, the stockholders were remediless.

In the case of Memphis City v. Dean (1868) the bill filed by the stockholder in the corporation averred that the corporation declined to sue. The court held, that the corporation had brought a suit in the state court, which was still pending, presenting the only question of which the plaintiff could compel the presentation, and that, therefore, the stockholder could not maintain in his own name, in another court, a suit presenting the same question.

In the case of Samuel v. Holladay (1868), before Mr. Justice Miller, of the supreme court of the United States, in the circuit court for the district of Kansas, there was, as the court says, in its opinion, no attempt to transcend the powers of the corporation, and no breach of trust on the part of the directors, but merely a neglect, on request, to bring a suit which one of the stockholders believed ought to be brought. The learned judge admits that the doctrine of the case of Dodge v. Woolsey recognizes the jurisdiction, where other parties are concerned, as extending to preventive remedies, to be used for the protection of rights endangered by the neglect of the directors and the threatened aggressions of others; and the doctrine he combats is, that an individual stockholder in a corporation can decide for the corporation when suits shall be brought to assert supposed rights, and, assuming the place of the corporation, "use the courts to enforce his private views in opposition to the sense of the directors, and probably of all the other shareholders." The case he was considering was a totally different one from that presented by the bill in this case. See the same case, reported as Samuel v. Holladay [Case No. 12,2:8].

In the bill before us there are many acts set forth which are ultra vires. On the allegations in the bill, it would appear that all issues of stock by the company, other than such as were specially authorized or approved by the acts of April 4th, 1860, April 2d, 1861, March 28th, 1862, May 4th, 1864 [supra], and April 21st, 1868 [1 Laws (N. Y.) p. 574], were unauthorized and illegal, and that no authority for the issuing of any stock by the company can be derived from the tenth subdivision of the twenty-eighth section of the general railroad act of April 2d, 1850 [Laws 1850, p. 225]. Besides the issues of stock not covered by the acts of 1860, 1861, 1862, 1864 and 1868, there are in the bill many acts charged in respect to the use and application of the corporate funds of the corporation, which were ultra vires of the corporation, and breaches of trust on the part of Gould, Fisk and Lane, who constituted a majority of the executive committee, to which committee, according to the bill, the administration of the affairs and funds of the company appears to have been wholly given up

by the board of directors. The bill, among other things, prays for preventive relief, by injunction, to restrain the corporation from issuing any new certificates of stock, except on the surrender and cancellation of certificates for existing valid stock, on a regular transfer thereof, and to restrain Gould, Fisk and Lane, who have committed such breaches of trust, from exercising any further powers as directors, executive officers or executive committee of the company, and from interfering with or disposing of its property, funds or affairs.

Now, so far as the bill sets out acts ultra vires, in issuing stock, and breaches of trust, which are frauds on the stockholders, such acts and breaches of trust are beyond the power of the corporation or its directors to affirm, or sanction, or make good; and, in such case, the authorities agree, that the reason of the rule for an application to the corporation, or its board of directors, to bring the suit, does not exist. Such reason is, that, while the stockholder is prosecuting his suit, the corporation, through its board of directors, may affirm and make good the acts complained of. But the rule ceases when the reason ceases. The bill is, therefore, clearly maintainable, in respect to the acts ultra vires which it sets forth, and the preventive relief it seeks, founded thereon, without reference to anything else contained in it.

It is a rule of equity pleading (Story, Eq. Pl. § 443) that, if a demurrer covers the whole bill, when it is good to a part only, it will be overruled. Livingston v. Story, 9 Pet. [34 U. S.] 632, 658. The demurrers, in this case, cover the whole bill. The first cause of demurrer assigned in each, the want of equity, or, that the plaintiffs have not stated such a case as entitles them to any such relief as they seek, is a cause of demurrer to the whole bill, and to each and every part of it. The demurrer for want of equity must, therefore, be overruled, as the bill is, at least, good in part. The thirty-second of the rules in equity prescribed by the supreme court allows a defendant to demur to the whole bill, or to a part of it.

But I think the bill states a case which brings it within the settled principles as to allowing a bill by a stockholder, where the corporation is under the control of the defendants who must be sued, and an excuse is given for the bringing of the suit by the stockholder, which is equivalent to a refusal by the directors, on request, to bring the suit.

The bill alleges, that, from July, 1868, to October, 1868, the board of directors of the company held no meeting, but left the management and control of the affairs of the company to Gould, Fisk and Lane, as executive officers, and to the executive committee of five, of whom Gould, Fisk and Lane were three. It also avers that, from and after the day of the election, in October, 1868, until the election of a new board of directors, in

October, 1869, no meeting of the board was held, except a special meeting, called to ratify some contract, at which no other business was transacted. Assuming that identity of names indicates identity of persons, in respect to the persons alleged in the bill to have been, at various times, directors of the company, it appears by the bill, that, of the seventeen directors who so failed to hold a meeting, as a board, from July, 1868, to October, 1868, nine (a majority of the whole) were re-elected directors in October, 1868, namely, Gould, Fisk, Lane, Thompson, A. S. Diven, Davis, Ramsdell, Skidmore and Groves; that of these nine, seven, (excluding Davis and Skidmore, who resigned), with the eight new directors, namely, Tweed, Sweeny, Miller, G. M. Diven, Hilton, Ganson, Sisson and Chapman, failed to hold any meeting of the board from the day of the election, in October, 1868, until the election of a new board, in October, 1869, except the special one before mentioned; and that, of such fifteen directors, eleven were re-elected in October, 1869, namely, Gould, Fisk, Lane, Thompson, A. S. Diven, Ramsdell, Tweed, Hilton, Ganson, Sisson and Chapman, and, with White, Otis, A. Gould, Smith, Simons and Hall, constituted the seventeen persons who were directors when the bill was filed, in April, 1870. It was during the period between October, 1868, and October, 1869, that the share capital of the company was increased by over $32,000,000. Of the seventeen directors elected in October, 1869, eight (excluding Gould, Fisk and Lane) are persons who thus wholly neglected their duties, and abnegated their functions, during the year ending in October, 1869. As to them, and as to their six new associates, brought in in October, 1869, the bill alleges, that, as a board, they possess no independent force for controlling Gould, Fisk and Lane; that Gould, Fisk and Lane have practically the absolute and unchecked control of the corporation, and its funds, property and affairs; that Tweed is in full accord with them in their schemes for private gain at the expense of the company, and has been, and is, personally interested in many of such schemes; that Smith was a copartner with Gould in said firm of Smith, Gould, Martin & Co.; that Hilton, White, Otis and Hall are salaried employees of the company, holding their offices at the pleasure of Gould, Fisk and Lane, or of Gould alone, and have only a nominal and trifling interest, if any, as shareholders in the company; and that Simons is in a substantially like relation with Gould, Fisk and Lane, being a salaried employee of the Narragansett Steamship Company, which is under the management and control of Gould, Fisk and Lane. Gould, Fisk, Lane, Tweed, Hilton, White, Otis, Hall and Simons constitute a majority of the seventeen directors. The bill also avers, that the independent action of some of the other directors is compromised by reason of their being under some pledge to support the policy of Gould, or resign, or they are in too small a minority to interpose any substantial check to the operations of Gould, Fisk and Lane, supported, as they are, by an overwhelming majority of the board in their interest, and that such other directors are in such relations with Gould, Fisk and Lane, as have prevented, and will prevent, them from, in any way, causing to be exerted the corporate power of the company to bring Gould, Fisk and Lane to account. The bill sums up its conclusion from the facts alleged in this regard, by averring, that the rights and equities, claims and demands, in favor of the company, which are set forth in the bill, cannot be enforced by suits brought in the name and on behalf of the company, for the reason that the control of the company is wholly in the hands of Gould, Fisk and Lane, and the plaintiffs are wholly unable to procure the bringing of a suit in the name of the company as plaintiffs against them. The allegations of the bill show satisfactorily that the company is under the actual potential control of the defendants Gould, Fisk and Lane, within the rule of equity jurisprudence before referred to, so that it would be a mockery to require or permit a suit against them to be brought and prosecuted under their management, to obtain the relief sought by this bill. These allegations are admitted by the company, which speaks for all the directors, by the demurrer which it has interposed. It is urged, by the counsel for the defendants, that the allegation of the bill, that the board of directors elected in October, 1869, is so constituted that it possesses no independent force for controlling Gould, Fisk and Lane, is a simple impossibility, for the reason that the fourteen directors do possess an independent force to control the three. But the facts set forth in the bill show that this is no impossibility. An absence of control is shown, facts showing dependence are shown, a failure to exhibit force is shown, a surrender of the entire corporation to Gould, Fisk, and Lane is shown, and a moral paralysis on the part of the fourteen directors is shown, which warrants the statement in the bill. If there ever was a case which called for the remedial power of a court of equity to be exerted at the suit of the stockholder for the benefit of himself and of his co-stockholders and of the company, to take cognizance of fraudulent breaches of trust on the part of the controlling directors, this is such a case; and it is a case where sufficient ground for the interposition is shown, without requiring a direct request to the corporation to prosecute, and its refusal.

Burt is not a stockholder, and is improperly joined as a plaintiff. As the suit is a joint one, his want of interest is a good ground of demurrer to the whole bill. Story, Eq. Pl. § 509. The objection is one to the substance of the bill. But the plaintiffs may, if they desire, under rule 35 of the rules in equity

prescribed by the supreme court, amend their bill, on payment of costs, by striking out the name of Burt as a plaintiff, and the allegations of the bill in regard to his claim to stock.

It is set forth as a ground of demurrer to the bill, that Eldridge, Thompson, Underwood, Bardwell, Jordan and Whitney are necessary parties to the bill, as being stated therein to have been concerned in the illegal and fraudulent acts in respect of which the bill asks relief. Those six persons were six of the directors from October, 1867, to October, 1868. This objection, if of avail, would apply equally to Evans and Gregory, who were directors during the same period, and to Groves, Sweeny, Miller, and G. M. Diven, who were directors from October, 1868, to October, 1869, for, while there are allegations in the bill, of complicity in breaches of trust and in fraudulent acts, that are applicable to the six directors so specified in the causes of demurrer, there are other such allegations that are applicable, some of them to the first two, and the others to the last four, of the last named six directors, who are not specified in the causes of demurrer as necessary parties. I exclude Work, Davis and Skidmore, because of the allegations in the bill in regard to them. But it is not necessary to make any of such twelve persons parties. The well settled rule is, that, if there are several trustees who are all implicated in a common breach of trust, for which the cestui que trust seeks relief in equity, he may bring his suit against all of them, or against any one of them separately, at his election, the tort being treated as several as well as joint. Story, Eq. Pl. § 213; Cunningham v. Pell, 5 Paige, 607, before cited.

Nor is it necessary that the Boston, Hartford and Erie Railroad Company, or Schell, or Vanderbilt, or the Narragansett Steamship Company should be parties to the bill. No relief is prayed for against them. The transactions with them by Gould, Fisk and Lane, which are complained of, are set forth, but the bill seeks to charge Gould, Fisk and Lane as tort-feasors. If the parties named have been in collusion with Gould, Fisk and Lane, in wrongfully obtaining the funds of the company, Gould, Fisk and Lane have no right of contribution over against such parties, and, therefore, cannot require them to be made parties to the suit. As to the company, the tort of each wrong-doer against it is several, and, neither in a suit by it nor by its stockholders, is every one of the wrong-doers a necessary party, because some one wrong-doer is a proper party. The doctrine above referred to in regard to several trustees implicated in a common breach of trust, applies equally to any wrong-doer confederated with a fraudulent trustee.

It is alleged, as a case of demurrer to the whole bill, that the fourteen persons, other than Gould, Fisk and Lane, who were, with them, elected directors of the company in October, 1869, are necessary parties to the bill, inasmuch as the bill prays to have the classification of directors of October, 1869, set aside, and thus shorten the term of such fourteen persons, who appear by the bill still to be directors of the company. Even if such fourteen persons be necessary parties in respect of the relief prayed in regard to such classification, and even if a demurrer to such relief would be maintainable for want of such parties, yet the demurrer in this particular is too general and must be overruled, because it covers the whole bill, and should have been a demurrer only to the relief prayed in regard to such classification. Story, Eq. Pl. § 443; Livingston v. Story, 9 Pet. [34 U. S.] 632, 658.

The objection that such fourteen persons ought to be made parties, as appearing to have been directors when the bill was filed, for the reason that the bill asks for an injunction against the corporation, and for a receiver of the corporation, is not well taken. The relief so asked is against the corporation. If such fourteen persons were made parties, they would be merely nominal parties and not real parties, in respect to any relief that is asked against the corporation; and no relief is asked as against them, except in respect to the matter of the classification, which has already been disposed of. This question was fully considered in the case of Hatch v. Chicago, R. I. & P. R. Co. [Case No. 6,204].

The views already stated dispose of the objection that Tweed is not a party to the bill. Though he is charged to have been in complicity with Gould, Fisk and Lane, relief is not asked against him.

As to the case of demurrer assigned, that the plaintiffs have waived an answer on oath, there is no doubt that the defendants have a right to answer on oath notwithstanding such waiver, and that the plaintiffs cannot, by tendering such waiver in their bill, deprive the defendants of the right to answer on oath. But, for the very reason that such waiver can deprive the defendants of no right, the waiver amounts to nothing, unless the defendants choose to accept it. Yet the plaintiffs have the right to tender it, as they have done, and, if the defendants should choose to answer without oath, the plaintiffs could not complain. The tender of the waiver is, however, no ground of demurrer. Notwithstanding the provision of rule 43 of the rules in equity prescribed by the supreme court, a plaintiff may tender such a waiver, if he chooses. If the defendant does not accept the tender, it is to be regarded as surplusage; but the defendant is still bound to answer the bill, either without oath or on oath.

It results, therefore, that the demurrers are overruled, and the bill is sustained in all particulars, except as to the joining of Burt as a party plaintiff, as to which the

plaintiffs may amend, as before stated, on payment of costs.

[NOTE. The defendants having brought a cross bill, moved that the subpoena to appear and answer might be directed to be served on the solicitors of the plaintiffs, the latter being out of the jurisdiction. The motion was denied. Case No. 6,307. In Case No. 4,513 a motion was granted for an attachment against Jay Gould, the president of the defendant company, for contempt of court in refusing to produce certain books and documents. In Case No. 4,514 sundry questions in a petition for relief for stock abstracted by Jay Gould were answered by the court, and a motion by the company to open a default taken was denied. In Case No. 4,515 a petition by Jay Gould to take proof of the title to said stock was denied, and an order for the suspension of the delivery of certain shares to Heath and Raphael was vacated. In Case No. 4,516 the commission of the master was fixed by the court.]